## ZEPHYR AIRCRAFT CORP. v. UNITED STATES.

### No. 47319.

United States Court of Claims.
June 3, 1952.

Kermit F. Kip, New York City, (Loring M. Black and William E. Buckley, New York City, on the brief), for plaintiff.

Carl Eardley, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff corporation, successor to the Lenert Aircraft Corporation, brings this suit pursuant to Private Law 660, 79th Cong., 2d Sess., June 15, 1946, 60 Stat. 1227, which is quoted in full in the margin.[1] As used hereinafter the word "plain-

1. Conferring jurisdiction upon the Court of Claims of the United States to consider and render judgment on the claim of the Zephyr Aircraft Corporation against the United States.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That jurisdiction is hereby conferred upon the Court of Claims of the United States to hear, determine, and render judgment on the claim of the Zephyr Aircraft Corporation, as succes-

tiff" refers also to the Lenert Corporation, before its name was changed to Zephyr Aircraft Corporation.

The theory of the plaintiff's case is that it entered a competition staged by the War Department in 1939 for new and improved designs of primary training aircraft, but that the War Department did not adhere to the terms of its invitation, nor to the requirement of the statute which governed such competitions, and that the plaintiff was damaged thereby.

The Air Corps Act of July 2, 1926, 44 Stat. 788, 10 U.S.C.A. § 310, authorized the Secretary of War and the Secretary of the Navy to invite the submission in competition of new designs for aircraft or aircraft parts or aeronautical accessories, the bidder to state the price at which he would sell his design, or at which he would furnish the aircraft or part depicted in the design, in various quantities. Pursuant to the statute, the War Department on March 11, 1939, issued its invitation to such a competition for primary training aircraft. One hundred and eighteen invitations to bid were sent out. Each invitation contained the following statement:

"This invitation for bids contemplates a quantity procurement of new and improved designs of Training (Primary) Airplanes, herein more particularly described, in accordance with the Provisions of paragraph (t) of Section 10 of the Act of July 2, 1926 (44 Stat. 788), (in conjunction with and) based upon the procedure set forth in paragraphs (a) to (i) of said Act, all of the pertinent and applicable provisions of which shall govern in the making of any award and/or procurements under the terms of this Circular Proposal."

Only twelve persons or companies, of which plaintiff was one, entered the competition.

The quotation from the invitation, recited above, said that the invitation contemplated a quantity procurement of planes, in accordance with the cited statute. Paragraph (c) of the statute says:

"(c) Contract with winner for furnishing items authorized; purchase of winning designs. Thereupon the said Secretary is authorized to contract with the winner or winners in such competition on such terms and conditions as he may deem most advantageous to the Government for furnishing or constructing all of each of the items, or all of any one or more of the several items of the aircraft, or parts, or accessories indicated in the advertisement, as the said Secretary shall find that in his judgment a winner is, or can within a reasonable time become, able and equipped to furnish or construct satisfactorily all or part, provided said Secretary and the winner shall be able to agree on a reasonable price. If the Secretary shall decide that a winner can not reasonably carry out and perform a contract for all or part of such aircraft, parts, or accessories, as above provided, then he is authorized to purchase the winning designs or any separable parts thereof if a fair and reasonable price can be agreed on with the

sor to the Lenert Aircraft Corporation, against the United States for compensation for damage, injury, and losses suffered by the said Lenert Aircraft Corporation, because of the refusal by officials of the War Department to make a contract with the said Lenert Aircraft Corporation in compliance with section 10 of the Act of July 2, 1926 (44 Stat. 784), pursuant to a design competition for the procurement of primary training planes, which was projected by circular proposal 39–635, dated March 11, 1939.

"Sec. 2. In the determination of such claim, the United States shall be held liable for damages, and for any acts com-

mitted by any of its officers or employees, to the same extent as if the United States were a private person.

"Sec. 3. Suit upon this claim may be instituted at any time within one year after the passage of this Act, notwithstanding the lapse of time, laches, the form and content of protest, and supporting papers thereof. Proceedings upon the determination of such claim and appeals from the payment of any judgment thereon, shall be in the same manner as in the case of claims over which the court has jurisdiction under section 145 of the Judicial Code as amended.

"Approved June 15, 1946."

winner, but not in excess of the price submitted with the designs."

Taken as a whole, the invitation is an incongruous document. It asks for bids on various numbers up to 1,000 of the planes embodying the bidder's design. Yet it asked for no statement or evidence as to what facilities, if any, the bidder had which would enable it to produce one thousand, or one, of the planes represented by its design. And it is hard to imagine that the War Department would award a contract for one thousand or any number greater than one, of a plane which, so far as the invitation expressly required, might exist nowhere except on a blueprint.

We think that a sensible reading of the invitation would indicate that a quantity procurement of planes was contemplated if the winner of the design competition offered a plane concerning the satisfactory performance of which the department would be certain. That might mean, as it seems to have meant to the department in this case that the "new and improved design" would have to be so like some existing plane that the department could know, to a practical certainty, that the plane, with its improvements, would perform satisfactorily. It seems also to have meant, and indeed it would seem that it must have meant, that the bidder had an operating plant available to manufacture the planes in quantity. It may be urged that this implied limitation upon the scope of the competition represented a departure from the intent of the Air Corps Act of July 2, 1926, which seems to have contemplated the possibility that a new design might be so convincing to the department that it might desire to contract for a quantity of the planes represented by the design. But the statute does not direct, but only authorizes the Secretary to contract with the winner of the design competition, and only on such terms and conditions as the Secretary might deem most advantageous to the Government.

The competition here involved was judged, first by an Engineering Evaluation Committee of six technically qualified officers, whose function was to appraise the performance and engineering qualities of the designs, and then by an Evaluation Board of three officers whose function was to appraise the designs from the standpoint of "suitability" and to select the winner or winners.

The competition closed July 7, 1939. On July 26 the Evaluation Committee submitted its first report and recommendation. It reported that six of the twelve competitors had submitted designs suitable for production in quantity. As to the plaintiff, the report said:

"3. *Designs Disregarded.* Engineering data relative to the following designs were disregarded for the reasons indicated * * *.

"Lenert Aircraft Corp. (Insufficient proof of ability to produce in quantity in time required.)"

The designs of five other competitiors were disregarded, some being for the reason, among others, given for disregarding the plaintiff's design.

On July 29 the Evaluation Board made its report to the Secretary of War recommending that Stearman Aircraft Division of Boeing Airplane Company, Brewster Aircraft Corporation, and St. Louis Aircraft Corporation be · designated as the winners of the competition. The report showed on its face that some of the designs submitted in the competition, including that of the plaintiff, had not been given a point score. On July 29, the Board made a supplementary report to the Chief of the Matériel Division pointing out that the Stearman Aircraft Bid No. 1 offered the same plane as the PT–13A. The Chief of the Matériel Division reported to the Secretary of War that the Air Corps had already procured 122 of the PT–13A planes, the first of them having been procured in 1931, and that it was a standard training-type plane.

The original report of the Evaluation Board was returned to it by the Secretary of War for the reason that the Board had not given point scores to all the designs submitted, nor given valid reasons for not doing so. It was the Secretary's view that the evaluation of the designs should take no account of whether or not the designed plane had been reduced to practice, or

whether the bidder was capable of producing the designed planes in quantity; that these were matters which would be considered by the Contracts Section, Matériel Division, in connection with the question of whether or not to award contracts to the winners of the design competition. The Engineering Evaluation Committee reconvened sometime between August 14 and August 22 and then submitted a supplementary report. That report said that the plaintiff's design was disregarded because of—

"Insufficient proof of capability of meeting performance, crew, equipment and furnishing requirements specified in the applicable Air Corps specifications and capability of airworthy flights at the gross weights provided."

In the invitation for bids, Circular Proposal 39–635, Plaintiff's Exhibit 1, Section III, Paragraph B under the heading, "Method of Evaluation for Figure of Merit," appears the following:

"(3) The Government may disregard any or all data offering airplanes which fail to satisfy the following conditions as determined by an engineering analysis of the data called for in Item 1 of this Invitation for bids:

"(a) Capability of meeting performance, crew, equipment and furnishing requirements specified in the applicable Air Corps Specifications.

"(b) Capability of airworthy flight at the gross weights provided in the applicable Air Corps Specifications.

"(c) Essential characteristics for safety, including strength at design gross weights and balances."

It will be observed that the Engineering Evaluation Committee, having been instructed to either give a point score to the designs of the plaintiff and the other competitors not previously given such scores, or to give reasons, authorized by the terms of the invitation for bids, for not doing so, gave all the reasons stated in (a) and (b) above, for "disregarding" the plaintiff's design. The Evaluation Board then reconvened on August 22, examined the rejected designs, interrogated members of the technical staff concerning the reasons for re-

jecting the designs, and considered the report of the Evaluation Committee. The Board then reported to the Secretary of War that all designs submitted had been appraised in accordance with the terms of the invitation for bids, and that the reasons for disregarding some of the designs were given in the attached report of the Engineering Evaluation Committee.

On August 17, the plaintiff, apparently having heard rumors of the impending results of the competition, addressed a protest to the Secretary of War. The Assistant Secretary of War replied that the winners had not been determined. On September 1, the plaintiff wrote another protest and on September 12 the Assistant Secretary replied that public announcement of the winning designs had been made on September 6, and that the plaintiff's design had not been a winner.

The winner announced on September 6 was the Stearman Aircraft Division of Boeing Airplane Company. Stearman, in view of the recommendation which the Board had made to the Secretary on August 22 that it be declared the winner of the competition, had on that day been invited to send a representative to Wright Field to negotiate a contract. As a result of negotiations, some of the specifications of the Stearman plane were changed and, on September 10, a contract for 480 planes was made with Stearman. During the years 1939 to 1945 the Government purchased some 4,000 Stearman planes, 7,000 Fairchild monoplanes and 1,300 Ryan monoplanes, all for primary training purposes. At the end of the war, the monoplanes were disposed of and the Stearman biplane was retained as the standard primary training plane. As we have said, we think that when the War Department issued its invitation for bids, it contemplated the procurement of a large number of planes and, therefore, impliedly limited the design competition to bidders who submitted designs of planes of proven ability to perform and who had facilities for their prompt manufacture in quantity. The original statement, then, of the Engineering Evaluating Committee that it disregarded the plaintiff's design because of insufficient proof of ability to produce in

quantity in the time required probably represented at least one of the principal reasons why, in the Committee's opinion, plaintiff's design was ineligible. To be sure, no information was requested in the invitation for bids concerning the plaintiff's ability to produce planes. But the Committee may well have known, by hearsay and report among persons familiar with the plane manufacturing business, how little the plaintiff had in the way of production facilities.

When the Secretary of War required the Committee to either give point scores to all the designs submitted, or give reasons consistent with the invitation for bids for not doing so, and the Committee gave, word for word, two of the three reasons recited in the invitation as reasons for disregarding the plaintiff's design, we think the Committee's statement was disingenuous. It may be that if the Committee had put its mind on all the points mentioned in the statement, it would have reached the conclusion that the plaintiff's design was defective in regard to all of them. But in the circumstances, we think the Committee was only going through the motions of giving what it thought was a technically satisfactory reason for a conclusion which it had reached some weeks before, and for other reasons.

▮ Our question is whether the facts outlined above show that a legal wrong was committed against the plaintiff. We think there was no such wrong. The plaintiff was fairly put on notice by the terms of the invitation for bids that this design competition was intended to eventuate in a contract for quantity production of trainer planes at an early date, in a world on the verge of war. It should have known that it would have been unthinkable for the War Department to contract for a large quantity of planes of a type which had never been flown, nor even built.

Even if the plaintiff's design had seemed, on paper, to be more promising than any other, it was, in the circumstances, unthinkable that the invitation contemplated that the War Department would delay quantity purchase for the years which would have been required to build a test model, then build a few more for more complete testing, and then negotiate a contract and have the plaintiff tool up a factory for quantity production.

We think the War Department, in the circumstances, had the right to limit its competition to designs of planes which were certain to be operable and which could be promptly produced in quantity, and we think it did so limit it. It would have been wiser to have stated frankly in its invitation the limits of the competition. By not doing so it maneuvered itself into a position where its statements were lacking in candour. But the plaintiff was not harmed by the department's conduct. It could not possibly have been awarded a contract for quantity production. At the time of the competition, monoplanes were not approved by the Air Corps Training Center for primary training use, because of, among other factors, poor visibility and high wing-loading which affected controllability and maneuverability. The War Department could not, as a practical matter, have forced upon its officers who were responsible for the training and safety of beginning aviators a type of plane which was disapproved by those officers.

The events subsequent to the awards made pursuant to the competition, though largely irrelevant, are outlined in the Findings of Fact. The plaintiff protested vigorously and its protest was rejected. The plaintiff discussed with a member of the Evaluation Committee and later with the Assistant Secretary of War the possibility of obtaining an experimental contract for a small number of planes, without competitive bidding, but the Assistant Secretary declined to agree to such a contract. The plaintiff lodged a protest with the Military Affairs Committee of the House of Representatives. An officer of the plaintiff other than Mr. Lenert called upon the Assistant Secretary of War, who said that the matter of the competition under Circular Proposal 39–635 was closed; that Mr. Lenert, the President of the plaintiff, was an unreliable and troublesome individual; that if Mr. Lenert was ousted from the corporation both as an officer and stockholder and if the plaintiff withdrew its protest concerning the award made under Circular

Proposal 39–635, the plaintiff would be considered for a contract for the production of a small number of experimental planes. A meeting of the plaintiff's stockholders was called, Mr. Lenert resigned the presidency and the name of the plaintiff was changed from Lenert Aircraft Corporation to Zephyr Aircraft Corporation. The protests theretofore filed with the Secretary of War and with the House Military Affairs Committee were withdrawn. The Assistant Secretary of War was notified of all these actions.

The Air Corps caused inspections to be made of the plaintiff's plant and personnel on June 11, August 13, and September 18, 1940. It was interested in finding new sources of supply for primary training planes. Apparently after the first of these inspections the Assistant Secretary of War informed the plaintiff that it would not be awarded an experimental contract. We have found that three factors entered into this decision, as follows: (1) Such an award might have been regarded as an admission that the award under Circular Proposal 39–635 had been erroneous; (2) Mr. Lenert was still connected with the plaintiff corporation as a stockholder and general manager and, (3) the inspection report was adverse to the plaintiff. The third of these factors was certainly a proper one. We have no reason to doubt the good faith of the inspector or his report, nor to find that his conclusion was wrong. The first factor is readily understandable. The War Department had, rightly, we think, refused to declare the plaintiff the winner of the competition. The plaintiff had protested vigorously and asserted that it had been unfairly treated. If in spite of its at least arguable paucity of facilities and personnel, an experimental contract had been awarded it, impartial observers might well have regarded the contract as a sop thrown to it for appeasement purposes rather than a proper step in strengthening the country's air arm. As to the factor concerning the personality of Mr. Lenert, we are hardly in a position to determine its merits. The Assistant Secretary of War had concluded that Mr. Lenert was an unreliable and troublesome individual. In spite of the changes that had been made in the plaintiff's formal structure, Mr. Lenert remained the general manager and the guiding spirit of the plaintiff. We suppose that a Government Executive, having the responsibility for making contracts on behalf of the Government, in cases not involving competitive bidding, has the right and the duty to refrain from involving the Government in contractual relations with a person whom he regards as unreliable and troublesome, or with a corporation managed by such a person. Whether the Assistant Secretary's appraisal of Mr. Lenert was correct or not, we have no basis for judgment. We have no reason to suppose that he did not in good faith hold the opinion which he frankly expressed.

As we have said, the post-award events recited above have no relevancy to the issue here for decision, except as they may shed light on the good faith of the actions taken before the award was made. In our opinion they do not show any lack of good faith.

Our conclusion upon the whole case is that the conduct of the Government's officials who had the responsibility for procuring flight-worthy training planes with reasonable promptness was directed to that end and to that end alone; that they, in selecting types of planes for quantity procurement, had no thought of improperly favoring any supplier of planes or discriminating against the plaintiff or any of the other competitors who failed to win in the competition. We think that, in the circumstances, an award to the plaintiff of a contract for the quantity procurement of a type of plane which existed only upon blueprints would have amounted to a reckless waste of public funds and of crucial time in the preparation of the country's defenses.

 The plaintiff urges that Private Law 660, quoted at the beginning of this opinion, conferring jurisdiction upon this Court to entertain this suit, is a confession of liability by Congress, leaving to the Court only the question of the amount of compensation which the plaintiff should recover. We think Private Law 660 does not so provide. It says that we are to "hear, determine, and render judgment on the claim" of the plaintiff. That is normal language for conferring jurisdiction upon a Court, either

generally or in special cases, to ascertain the facts, apply the law, determine that there is, or is not, liability, and if there is liability, the amount of it. There is nothing in the legislative history which indicates that Congress intended that the language of Private Law 660 should have any special meaning.

If we agreed with the plaintiff that Private Law 660 was a confession by Congress of wrong-doing on the part of the War Department in refusing to make a contract with the plaintiff, we would still be completely frustrated in attempting to fix an amount of liability. The plaintiff's petition asks for damages in the amount of $9,834,500. This includes all the profits which it says it would have made if it had been awarded the contracts for 3306 primary training planes, and many other items of damage.

At page 218 of the Record the plaintiff says:

"Furthermore, whether the plaintiff would or would not have won the competition is not the issue. The issue here always has been that plaintiff was prevented from winning the competition because the defendant wrongfully refused to evaluate its plane."

At page 254 the plaintiff says:

"There is no assumption on the part of the plaintiff that it would have been the winner, except the legal assumption which the well settled rules of law have given to it. Whether it would or would not have won the competition is beside the point."

At page 261 the plaintiff says:

"Whether or not the plaintiff would have received a contract from the Assistant Secretary of War is beside the point. Suffice it to say that Congress clearly understood the situation and made the refusal to give a contract to the plaintiff actionable.

"No proof was necessary that plaintiff be the winner; all that was needed was proof that the defendant *prevented* the plaintiff from ever being the winner by its refusal to evaluate the plaintiff's design."

As these quotations from its argument show, the plaintiff has not sought to convince us that it would have won the competition if the competition had been properly conducted. The first quoted statement is not consistent with itself since one has *not* shown that he was prevented from winning a competiton unless he shows that he would, but for the conduct complained of, have won it. The second quoted statement relies upon an asserted legal doctrine that if one is unfairly impeded in the competition, the law will award him the first prize, or at least some prize, without further inquiry as to what were his chances of winning. We think there is no such legal rule.

The English case of Chaplin v. Hicks, 1911, 2 K.B. 786 goes as far as any case has gone. There the plaintiff had qualified for the finals of a beauty contest in which twelve prizes were to be awarded among the fifty finalists. The promoters of the contest failed to give the plaintiff notice of the time and place of the final selections. The Court sustained a verdict for the plaintiff which estimated her chance of winning a prize at about one in four, and compensated her accordingly for the loss of that chance. We think the Court would not have permitted an instruction to the jury that even though they were convinced, from the appearance of the plaintiff and the other evidence, that she could not win a prize, they should nevertheless award her substantial damages. See 5 Williston on Contracts, Rev.Ed. Sec. 1346; Restatement, Contracts, Vol. 1, § 332; 46 Harv.L.Rev. 696, 699. In cases such as Weisz v. Price, 186 Iowa 640, 172 N.W. 939, where the plaintiff proved that she had won the competition, but the defendant refused to award the prize, plaintiffs have, naturally, prevailed. In Ft. Worth and D. C. R. Co. v. Willie S. & J. B. Ikard Co., Tex.Civ.App., 140 S.W. 502 the plaintiff sued the railroad company for delay in carrying the plaintiff's livestock to an exposition where, the plaintiff alleged, it would have won cash prizes if it had arrived in time to compete. The Court held that the plaintiff's asserted damages were too remote and uncertain to form the basis for a judgment. In Western Union Telegraph Co. v. Crall, 39 Kan. 580, 18 P.

719, the defendant, by inaccurately transmitting a telegram, caused the plaintiff to fail to get his race horse to a series of races, in which, the plaintiff asserted, the horse would have won prizes. The Court denied recovery on the ground of uncertainty and contingency. In Phillips v. Pantages Theatre Co., 163 Wash. 303, 300 P. 1048, the plaintiff had won a preliminary "movie contest for beginners" based upon audience applause, in a competition for a trip to Hollywood. The promoters denied her the opportunity to appear in the final contest, which was also to be decided upon the basis of audience applause. The Court held that the plaintiff's asserted damage was purely speculative and conjectural and denied recovery.

Under either the stricter rule of the American decisions, or the more liberal rule of the English case cited above, the plaintiff cannot recover. It had no chance of winning the competition.

The plaintiff's third contention, quoted above, is only a restatement of its argument, hereinbefore dealth with, that Congress, by Private Law 660 confessed liability on behalf of the Government. We think it did not. But even if it had, we would also have to find that it had enacted a novel rule for the measure of damages, before we could award damages to the plaintiff on the facts of this case.

The plaintiff's petition will be dismissed.

It is so ordered.

JONES, C. J., and HOWELL, WHITAKER, and LITTLETON, JJ., concur.