AIR TECHNOLOGY CORPORATION *vs.* GENERAL ELECTRIC
COMPANY.

Suffolk.    April 8, 1964. — June 10, 1964.

Present: SPALDING, WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Contract,* What constitutes, Joint enterprise, Subcontract, "Team" project.
    *Joint Enterprise.    Damages,* For loss of business opportunity.    *Agency,*
    Scope of authority or employment.    *Equity Jurisdiction,* National de-
    fence project.

Subsidiary findings by a master respecting a talk between a program man-
    ager of an electric company in charge of obtaining for it the prime
    contract on an Air Force project involving the use of electromagnetic
    sensors and representatives of an electronics corporation desirous of
    designing and manufacturing the sensors, and respecting the subsequent
    conduct of the two concerns, did not warrant a conclusion that there
    was a joint venture with respect to the prime contract, but did warrant
    conclusions that there was a joint undertaking by the concerns, as
    "team" members, to obtain the prime contract for the company, that
    each concern risked its time, expenditures and preliminary work, that
    the company agreed that if it received the prime contract it would enter
    into a subcontract with the corporation for the furnishing of the sen-
    sors at cost plus a fair profit, subject to Air Force approval, and that
    the company, by failing to press for the corporation's continuing par-
    ticipation in the project and by itself competing for the sensor work,
    broke its agreement and deprived the corporation of a valuable business
    opportunity for a part in the project.    [623–626]
A quotation by an electronics corporation to an electric company for the
    design and manufacture of sensors for an Air Force project was not
    a proper basis for a determination by a master in a suit in equity of
    the corporation's damages for loss of a valuable business opportunity
    through a breach by the company of an agreement that if it should
    receive the prime contract for the project it would enter into a subcon-
    tract with the corporation for furnishing the sensors at cost plus a fair
    profit, subject to Air Force approval, and in the absence of adequate
    subsidiary findings by the master, the case was remanded to the Supe-
    rior Court for reconsideration of such damages, which should be at
    least the higher of the value reasonably expended by the corporation in
    the performance of the joint arrangement or the fair value of its con-
    tribution to that arrangement.    [627–629]
Subsidiary findings by a master warranted a conclusion that a program
    manager of an electric company "in charge of" obtaining for it the
    prime contract on an Air Force project involving electromagnetic sen-

sors had authority to bind the company to an agreement with another concern to enter into a subcontract for the sensors on receiving the prime contract.   [629–630]

In the circumstances of a suit in equity wherein an electronics corporation established a breach by an electric company of an agreement to enter into a subcontract with the corporation for the supplying of electromagnetic sensors for an Air Force project, important to the national defence, upon the company's obtaining the prime contract for the project, the final decree should provide for the payment of damages without injunctive relief.   [630]

BILL IN EQUITY filed in the Superior Court on June 5, 1962.

The suit was heard by *Lurie, J.,* on a master's report.

*Edward H. Bennett, Jr. (Joseph H. Choate, 3rd,* with him) for the plaintiff.

*Warren F. Farr (George T. Finnegan* with him) for the defendant.

CUTTER, J.   The plaintiff (AT) brought this bill in equity (1) to restrain the defendant (GE) from using information supplied to it by AT in connection with an Air Force project (the 477L project), (2) to obtain a declaration that GE has committed breaches of a fiduciary relation to AT, and (3) for damages.   A master's report was confirmed by an interlocutory decree from which GE appealed.   Both AT and GE appealed from a final decree which awarded to AT $128,734 plus interest and costs, but denied injunctive relief.

At some time after 1957, the Air Force undertook the 477L project to establish installations in North America for detecting and determining the direction and yield of nuclear detonations.   This was to be done by methods including the use of electromagnetic (EM) sensors.

In 1960, Dresser Industries (Dresser) discussed the program with the Air Force, and in February, 1961, Dresser and GE agreed in writing to submit a "team proposal" to the Air Force.   GE was to have "prime responsibility of the overall contract."   Dresser was to have "responsibility for the sensory system area and participation in the overall system engineering . . . as a subcontractor."

GE established within its Defense Systems Department, a group, charged with presenting the proposal, under one Hynes, an engineer, as program manager, and one Carp.

Hynes had engineering and financial control and "was responsible for success of all [its] aspects . . . and . . . for seeing . . . that the purchasing department was doing its job on the program. He had no actual authority to enter into contracts" for supplies or services. This was "a function of the purchasing department."

AT and its predecessor corporations had considerable experience in the detection of EM radiation. Dr. Hillger and Dr. Clapp of its staff were experts in electronics research and design. On April 21, 1961, AT discussed the 477L project with the Air Force and learned of eight companies which had done some preliminary work. AT wrote to all but one of these expressing willingness to contribute toward any proposal which the addressee might submit.[1]

On May 23, 1961 (following a telephone call from Hynes to one Cunningham, contract representative of AT), Dr. Hillger and Dr. Clapp met in Syracuse with Carp and scientific representatives of GE.[2] Dr. Hillger outlined the system which AT proposed for the EM sensor portion of the 477L project. GE's representatives indicated interest. It then was agreed that Dr. Clapp would do more research to demonstrate the accuracy of the AT approach. Carp stated that if AT could satisfy the Air Force accuracy requirements, GE would be interested in having AT join in submitting a proposal.

A further meeting was held on June 7, 1961. At Hynes's suggestion Cunningham was present. Carp furnished to Dr. Clapp "a detailed outline of the GE proposal" and "asked him to cover a portion of the section entitled elec-

---

[1] AT thereafter provided information to several competitors of GE in connection with the program and used in its proposals to these competitors the fruits of research by Dr. Clapp in the summer of 1961. At the first conference with GE on May 23, 1961, the AT people told the GE representatives that AT was approaching other companies. Cunningham of AT also told Hynes on September 26, 1961, that AT was participating as a team member with other companies to which it had submitted technical proposals on the 477L project.

[2] At the beginning of the conference Carp said that "he could not listen to . . . any proprietary information." Dr. Hillger replied that "AT . . . would not treat its information as . . . proprietary." On later occasions, upon entering the GE plant, Cunningham, Dr. Hillger, and one Ekstrom of AT signed statements on the back of their visitor's badges "to the effect that no disclosure made . . . was to be deemed proprietary or confidential unless pursuant to an agreement in writing signed by an authorized representative of GE."

tromagnetic sensory subsystem." Carp also described how best to present the data to the Air Force. Hynes and Cunningham separately discussed "how AT was going to fit into the program on the sensor end. This was all subject to what the Air Force might want." Hynes stated that Dresser "was part of the team, and . . . that if Dr. Clapp and Carp had a satisfactory meeting, AT would be a team member, subject to Air Force approval."

Later that day Hynes and Cunningham talked with the scientists. At some stage Carp said they were "all set." Cunningham asked how "the two companies could get together . . . 'on a team membership basis.' . . . Hynes then wrote out a proposed course of action, and . . . Cunningham copied it verbatim. This provided that AT was to submit a proposal to GE . . . justifying the scientific basis for use of the . . . [EM] sensor; to assist in the preparation [and presentation] of the . . . proposal . . . and, in response to . . . [a] request for quotation [RFQ] . . . from GE for the design, development, and fabrication of a prototype system, to prepare a technical proposal for overall EM sensory equipment and support requirements . . . and cost quotations."

On June 26, Carp visited Dr. Clapp. Dr. Hillger and other AT employees were present. They reviewed the work Dr. Clapp had done since the June 7 meeting. Carp said "that it looked as if AT would get the results GE was looking for" but that Air Force accuracy requirements still had not been met. Methods of achieving greater accuracy were discussed.

During June and July, Dr. Clapp did further research.[3] Carp was also collecting data. During this period AT representatives continued (see fn. 1) to confer with, and to submit proposals to, other companies.[4]

---

[3] This was largely based upon data "in government reports available to anyone having access to classified material." It involved a high type of theoretical physics, required considerable effort, and "was original in the sense that it had not been done before and was of value." It, however, was not "novel for scientists working in the nuclear sensor field."

[4] The Air Force received thirteen technical proposals. In six AT was mentioned as a proposed subcontractor or team member.

By August 11, 1961, GE had AT's technical proposal. Hynes had asked Cunningham for information about AT personnel, especially those associated with a contract between AT and Defense Atomic Support Agency (DASA) awarded on July 15. On August 9, AT sent a letter of interest to GE setting forth the qualifications of AT and its personnel and stating that AT "will serve as a member of the . . . [GE] team in the preparation of the planned proposal . . . and in the accomplishment of the work required." GE then submitted to the Air Force its letter of interest, which contained references to GE's "industry team, including Dresser." The letter pointed out that GE's capability had been "augmented by . . . such team members as . . . Dresser . . . (specializing in seismic sensors)" and AT (specializing in EM sensors).[5]

The Air Force then sent to thirty-six companies, including GE, a request for a proposal.[6] GE promptly sent RFQs to its potential vendors. Hynes mentioned AT and Dresser to GE's purchasing department as competent in the sensor field. A printed form of cost-plus-fixed-fee (CPFF) subcontract was sent to AT with the RFQ.

On September 26, Hynes showed Cunningham GE's letter of interest, and "Cunningham called attention to the apparent inconsistency between the listing of AT as a second tier subcontractor [fn. 5] . . . and the description of AT as a team member elsewhere in the document. Hynes said, 'Forget it. That is a mistake,' and told Cunningham that AT was shown as a team member . . . on the cover of the proposal."

---

[5] Eight of AT's employees were listed "as having program responsibility in the EM sensor field." AT was listed on the organizational chart as a potential second tier subcontractor of Dresser under the heading "Team Responsibilities." AT's responsibility was shown as "[c]onsultation, design, development, and fabrication of" EM sensor equipment.

[6] With this was sent out a report from Mitre Corporation, a nonprofit research organization, indicating how the 477L program might be accomplished. That report included material concerning EM sensors "similar to, but not identical with, that" in AT's proposal to GE (see fn. 7). AT was asked to quote on two groups of each of two items, a "yield determination component" and an "EM direction component." Dresser's bid on each item was substantially lower than AT's corresponding bid.

On October 5, GE submitted a proposal to the Air Force bearing on its covers the names of GE, AT, Dresser, and two other companies. The biographies of AT's personnel were identical with those attached to GE's letter of interest. The EM sensor was shown as an item which GE proposed to buy rather than to manufacture and the only potential source given was AT.[7]

Dr. Clapp and Dr. Hillger participated in an oral presentation of the GE proposal to the Air Force on October 18. One Air Force written question concerning the EM sensor was answered by Dr. Clapp for GE. During the presentation references were made to the DASA contract.

Early in November, GE was selected as prime contractor by the Air Force, provided a suitable contract could be negotiated. This selection was not on the basis of GE's proposal (which was not completely acceptable technically) but rather on a statement of its expected performance. After two months of negotiations a contract became effective February 5, 1962. The specifications were not formally approved until June, 1962, and these "differed drastically in . . . technical respects from the system originally proposed by GE." Hynes told Cunningham at the time of the award, "[Y]ou people had . . . a lot to do with our getting it."

On November 28, after failing to find Hynes and Carp in Syracuse, Dr. Hillger and Ekstrom, manager of AT's contract department (see fn. 2),[8] talked with some GE procurement people about possible subcontract terms. Dr. Hillger stated "that AT considered itself a team member and ex-

---

[7] Dr. Clapp's work with respect to the yield component was set out in GE's proposal substantially as received from AT and was represented by formulae which appeared in the GE proposal but not in the Mitre report (fn. 6). Twenty-one pages of the proposal discuss the EM sensor. Thirteen of these contain material identical with material in AT's proposal to GE.

[8] They knew that no subcontract was likely to be awarded until the prime contract had been executed, that they would have to negotiate with GE's procurement people, that each subcontract must be approved by the Air Force, and that there might be changes in technical requirements. They were familiar with the Armed Services Procurement Regulations (ASPR) found in 32 CFR and Air Force practice, and were aware "that more times than not the submission of a cost estimate did not result in . . . a contract on" that basis.

pected a subcontract for the EM sensor." The GE people
said that GE could not give AT a subcontract until GE obtained the prime contract.

Late in December, Cunningham of AT learned that
Dresser[9] had theretofore submitted a quotation on the EM
sensor. He called Carp at GE and inquired why Dresser
had bid on this. "Carp said that he didn't know . . . that
he didn't see how anyone but AT could do the EM sensor
and justify it to the Air Force." He was, however, critical
of some of AT's prices.

On January 2, one Taplow of GE's procurement unit
"told Dr. Hillger that Dresser had been asked . . . for a
proposal on the entire sensory system, and that it would be
appropriate for AT to quote to Dresser on the EM portion." Dr. Hillger replied that "AT expected a sole source
procurement from GE on the EM sensor, and that there was
no reason for AT to submit a bid to Dresser." This was
the first use by AT or GE of the words "sole source procurement." Taplow stated "that he regarded this as a
competitive situation." That day, Dr. Hillger restated his
"position to . . . Hynes and asked for his understanding.
Hynes replied that GE was then negotiating with the Air
Force and that it was . . . [GE's] intention . . . that AT
would receive a sole source procurement for the EM sensor.
He outlined the necessary steps: (1) that definite specifications must be approved by the Air Force, (2) that AT must
be approved as a sole source contractor by the . . . Air
Force," and (3) that the GE purchasing department would
issue a purchase order to AT.

On January 5, 1962, representatives of Dresser asked
Cunningham of AT for information concerning the EM sen-

---

[9] In November, GE had sent to Dresser a copy of GE's proposal to the Air
Force with eleven pages relating to the EM sensor deleted. Dresser asked for
the deleted pages. Hynes replied that they contained proprietary information
belonging to AT. Representatives of Dresser later examined the eleven pages
at the GE office. In December, GE representatives consulted several possible
vendors of the EM sensor other than Dresser and AT, and sought a quotation
on a CPFF basis from Dresser on the whole sensor subsystem (including the
EM sensor). Dresser affixed proprietary restrictions to its response. As a
consequence it was not considered by GE. No other RFQ was sent out prior
to February 26, 1962.

sor aspect of the GE proposal, so that Dresser could reply to GE's RFQ of December 20, and asked also if AT would quote to Dresser. Cunningham said "that AT would have to seek legal advice, that they were quoting to GE." There was "no evidence that GE . . . prior to . . . [the] suit informed AT . . . of the letter agreement with Dresser" of February, 1961.

Dr. Hillger and Cunningham conferred on January 8 with GE's procurement people, including one Becker, manager of materials. Cunningham "stated that Dresser receiving the complete sensor package was at odds with AT's understanding with GE, which was that AT was to receive the EM sensor part as its reward for its participation . . . as a member of the GE team." He said that AT felt "that GE had picked their brains and was now trying to get rid of them." Becker said that this was a "fouled-up procurement . . . he knew of no agreement between GE and AT; that so far as he knew the procurement should be handled competitively . . . that they should talk to . . . Hynes."

Hynes met that evening with Dr. Hillger and Cunningham in "a stormy session." Hynes said that "it was his prerogative to" ask Dresser to bid on the EM sensor. Cunningham said that AT would not provide Dresser with a quotation and that "AT was entitled to a sole source award, since this was a joint venture. Hynes denied this and said that AT was an associate member, not a team member." Cunningham and Hynes had not previously discussed what "team member" meant and Cunningham was not sure what "joint venture" meant. Hynes said "that AT would be taken care of if it didn't create a fuss."

The Air Force contract made the EM sensor of considerably increased importance. The prime contract was on a cost-plus-incentive-fee (CPIF) basis, with a "target cost" of $1,709,755 and a "target fee" of $95,000, rather than the CPFF basis proposed by GE. GE stood to receive additional compensation if it reduced costs by more than $47,500 below the target cost but might lose as much as $170,975 if costs exceeded the target cost. Accordingly, it became nec-

essary for GE to "be careful with respect to" costs. AT did not appear "as the sole source for the EM components." The contract did not state whether the "source" of the EM components was both to design and to manufacture the items. Any subcontract would require Air Force approval.

On February 14, Hynes told Cunningham "that the Air Force had imposed a tough contract on GE." He "said that AT was not going to do the prototype, that GE was going to do it and that he had already spent \$57,000 of his overhead on equipment" for this. On February 19, the GE people stated "that GE could spend its money as it saw fit," that AT had not "put a proprietary stamp on" its information "and had no letter of agreement."

On February 26, GE sent RFQs for the EM sensor to three companies, including AT, in accordance with purchasing procedures approved by the Air Force.[10] Quotations were sought on a firm fixed price basis for three EM sensors to be delivered in three months after the receipt of a purchase order. AT's quotation on March 19 (because on a fixed price basis), included a figure for profit of ten per cent of total estimated direct and indirect cost rather than seven per cent as in the earlier CPFF quotation. All bids received were rejected because they were not good enough (an engineering decision) and because the costs appeared to exceed what GE could afford under its prime contract.

On May 31, GE sent out to AT and four other companies another RFQ on the EM sensor. It gave the bidder opportunity to bid on the yield component of the EM sensor. Bids were to be on a fixed price basis for manufacture or for both design and manufacture. The RFQ listed the accompanying drawings as proprietary data of GE. Its form indicated that most design effort on the EM sensor had been accomplished.

---

[10] The master found that it is "very exceptional for the Air Force to approve a sole source procurement," although this is possible in certain instances. See ASPR, §§ 3.107–4 (revoked 1962), 3.108 (amended 27 Fed. Reg. 3448), 3.210–2 (amended 27 Fed. Reg. 3448), 3.807–4 (a) (5), 3.807–6, 3.900 to 3.903–4. See also §§ 7.104–40 (amended 27 Fed. Reg. 6133); 7.402–8 (amended at various times).

The master's general findings, based upon his subsidiary findings, may be summarized: (1) The information furnished by AT to GE was not a "trade secret." Similar information was furnished to GE's competitors. GE owed AT no duty based on this information (apart from any joint venture obligation based on agreement between AT and GE). (2) Any agreement between GE and AT was reached at the meeting on June 7, 1961. Then it was agreed that AT would be a "team member," participating in GE's "proposal . . . and, subject to Air Force approval . . . in the program if . . . [GE] should be awarded a prime contract." (3) Hynes, who had authority to bind GE so far as AT was concerned, designated what AT was to do toward the general objective. (4) GE and AT understood by the term "team membership," which GE selected, that, if AT followed Hynes's instructions and if GE received a prime contract, AT would receive a subcontract covering design and manufacture of both the EM yield and direction components, subject to Air Force approval.[11] The subcontract provisions would be governed by the terms of the prime contract, by ASPR, and by fair negotiations between AT and GE. "Use of the word 'team' was more than a sales pitch . . . [and] was intended to mean more to AT than opportunity to bid." GE should be held to its ordinary meaning. (5) GE's actions after June 7, 1961, until February 19, 1962, so far as known to AT, were consistent with the arrangement outlined above, especially Hynes's confirmation on January 2, 1962, "that AT would receive a sole source procurement for the EM sensor." (6) AT's fully disclosed dealings with other companies (see fn. 1) were not

[11] The master further analyzed the contract as follows: GE and AT engaged in a joint undertaking to obtain a prime contract for GE. AT was to be responsible for proving the EM sensor's accuracy, for its design, and for cost estimates. GE was to have prime contract responsibility. Both risked their effort and expense, and AT assumed the further risks that its work might not satisfy GE and that the Air Force might not approve a subcontract which would permit AT its costs and a reasonable profit. The arrangement required GE (a) to keep AT informed of negotiations concerning the EM sensor; (b) "to use its best efforts to secure Air Force approval of" AT's continuing participation; (c) to negotiate fairly; and (d) to refrain both from using AT's information without fulfilling its part of the agreement and from performing AT's part of the work.

inconsistent with AT's obligation to GE. (7) AT carried out its undertaking, and it "is inferable that . . . [AT's] work played a significant role in GE obtaining the award." GE did not perform its undertaking. It "made no effort after its formal proposal to obtain Air Force approval of AT as a sole source" for the EM sensor. GE rejected all bids on the RFQ of February 26, 1962, instead of proceeding to negotiate in good faith with AT for a subcontract. Giving AT an opportunity to bid, without more, did not fulfill GE's obligation to AT. (8) GE's development of a prototype and the "May 31 RFQ which permitted quotations on manufacture alone as well as upon manufacture and design," represented a "deliberate violation" of GE's undertaking. Although up to November 28, 1961, GE intended to fulfill its agreement, by the spring of 1962, GE had decided to prepare its own design for the EM sensor (using AT's information among other aids) and to compete with AT for its manufacture. (9) AT's proposal of March 19, 1962, taken with that of September 11, 1961, provides adequate basis for assessing damages for breach of the agreement to award a subcontract. Any uncertainty about these figures, because they do not result from "a negotiated subcontract . . . arises from" GE's failure to perform its agreement "to negotiate a subcontract." (10) There is no basis for determining damages for breach of any agreement to award a subcontract for quantity production or for determining the fair value of AT's services on a quantum meruit basis. (11) AT is entitled to recover $128,734. This is based upon allowing AT a price seven per cent above what AT would have received from GE in reimbursement of its estimated costs, less AT's savings through not having to perform.

1. We may draw our own conclusions from the master's very complete subsidiary findings. *Samia* v. *Central Oil Co.* 339 Mass. 101, 122.

2. A request for a proposal does not constitute a contract. See *Cronin* v. *National Shawmut Bank,* 306 Mass. 202, 210. Here, however, there was more than such a re-

quest.   GE sought AT's aid in obtaining and carrying out a prime contract for this largely unspecified, untested nuclear detection system.   Success depended upon (a) satisfactory research, design and combination of the known scientific materials into a workable end product; (b) proof of that product's effectiveness and accuracy; and (c) the capacity of the GE team to meet the probably changing ideas of the Air Force.   Against this background, the talk between Hynes and Cunningham on June 7, 1961, and GE's and AT's subsequent conduct[12] must be appraised.   The parties might have been more precise in their arrangements but the ill defined character of the project made precision difficult.

The use of the term "team member" leads us to infer that the parties intended a contractual association in some form of joint undertaking.[13]   The master regarded this essentially as a joint venture.

The subsidiary facts do not indicate that GE and AT intended that the prime contract was to be a joint venture within that indefinite term's ordinary usage.   See Bogert, Trusts and Trustees (2d ed.) § 488; Williston, Contracts (3d ed.) §§ 318–318C; Rowley, Partnership (2d ed.) §§ 52.1–

---

[12] What the parties intended is indicated by GE's subsequent conduct e.g. (1) listing AT in the letter of interest as a subcontractor, "team member," and the only potential source of the EM sensor; (2) designating (see fn. 5) AT's personnel as "the only individuals . . . having program responsibility in the EM sensor field"; (3) Hynes's statements that showing AT as a second tier subcontractor was a "mistake," and that it was GE's "intention . . . that AT would receive a sole source procurement for the EM sensor"; (4) treating Dr. Clapp, Dr. Hillger, and AT's DASA contract as team assets in the proposal presentation; (5) GE's early treatment (see fn. 9) of AT's EM sensor material as entitled to protection from Dresser; (6) GE's assistance in and use of Dr. Clapp's research in the summer of 1961; and (7) the absence of any GE suggestion to AT prior to December, 1961, that in the EM sensor work Dresser or other companies, and (above all) GE, were to compete with AT.

[13] The arrangement is governed by the law of New York, because any contract for a joint venture or other association was made in New York.   *Seemann v. Eneix,* 272 Mass. 189, 193–194.   *West Side Motor Exp. Inc.* v. *Finance Discount Corp.* 340 Mass. 669, 671.   *Wetherell Bros. Co.* v. *United States Steel Co.* 200 F. 2d 761, 763 (1st Cir.).   Cf. Restatement 2d: Conflict of Laws (Tent. draft No. 6, 1960), §§ 332, 332b, 346.   Cf. also *ibid.* (Tent. draft No. 7, 1963) § 151d.   Even if damages for GE's breach of the arrangement should be determined by the law governing the performance of the arrangement rather than by the law governing the arrangement, the applicable law would be that of New York where GE's performance was presumably to take place.   See Restatement 2d: Conflict of Laws (Tent. draft No. 6, 1960) §§ 346a, 346c, 346d. It is not argued that the Massachusetts law and the New York law differ substantially in relevant respects.

52.62, esp. §§ 52.3, 52.8–52.14, 52.21–52.22, 52.25, 52.29.     AT
was to be only a subcontractor.     There was to be no such
sharing in the profits of the prime contract, no such joint
interest in particular assets, and no such joint control of
performance as would ordinarily exist·in a joint venture in
the usual sense.     See *Cardullo* v. *Landau,* 329 Mass. 5, 8;
*Samuel* v. *Bastress,* 267 N. Y. 279, 283; *Steinbeck* v. *Gerosa,*
4 N. Y. 2d 302, 317–318; *Cooper* v. *Henkind,* 56 N. Y. S. 2d
846, 849–850 (Supr. Ct.); *Hasday* v. *Barocas,* 10 Misc. 2d
(N. Y.) 22, 26–29 (Supr. Ct.).[14]

There was, however, a more limited joint undertaking by
GE and AT, as team members, to obtain the prime contract
for GE, with the expectation that AT would obtain benefits
as a subcontractor.     In this undertaking certain aspects of
the usual joint venture did not appear.[15]     Nevertheless,
both GE and AT made substantial contributions to the team
effort in time and expenditure and risked the value of their
preliminary work.     Even if the arrangement did not con-
stitute a typical joint venture[16] GE (as controlling captain
of the team) may be held to its contractual responsibility to
AT as a team member.

The arrangements of June, 1961, as interpreted by the
parties' actions indicate to us a contract for a joint under-

---

[14] See also *Estabrook* v. *Woods,* 192 Mass. 499, 502–503; *Ross* v. *Burrage,*
233 Mass. 439, 447–448; *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226,
233; *Tidewater Constr. Co.* v. *Monroe County,* 107 Fla. 648, 653–658; Nichols,
Joint Ventures, 36 Va. L. Rev. 425; Taubman, What Constitutes a Joint Ven-
ture, 41 Cornell L. Q. 640; Berle, Developments in the Pattern of Corporate
Joint Enterprise, 14 Bus. Lawyer 309.

[15] GE had control of the joint effort, but there was some consultation with
AT.     See *Kleinschmidt* v. *United States,* 146 F. Supp. 253, 256 (D. Mass.),
which suggests that equal joint control may not be essential to a joint venture.
See also Rowley, Partnership (2d ed.) §§ 52.11, 52.32.     Also, probably neither
GE nor AT could have created an obligation binding the other (without its con-
sent) to third persons.     To that extent there was no quasi partnership, but
there was no occasion for either GE or AT to make any commitment for the
other (without its consent) in presenting the proposal.

[16] As the holding is that GE committed a breach of contract we need not
consider (a) whether the team undertaking of GE, as coördinating prime con-
tractor, and AT, as one of a group of prospective subcontractors, was in some
respects analogous to a joint venture (see *Wilson* v. *Jennings,* 344 Mass. 608,
614–615; see also *Warsofsky* v. *Sherman,* 326 Mass. 290, 292–293; cf. *Sher* v.
*Sandler,* 325 Mass. 348, 350), or (b) the special liabilities of joint venturers.
See *Meinhard* v. *Salmon,* 249 N. Y. 458, 463–464.

taking with the characteristics which the master found to exist. See fn. 11, *supra.* We agree with the master that "team membership was intended to mean more to AT than opportunity to bid in the program," and that (at least by implication) GE undertook that, if it "received a prime contract . . . AT [subject to Air Force approval] would receive . . . a subcontract" for the EM sensor, which (whether on a CPFF or a fixed price basis) would give to AT reasonable opportunity to recover its costs plus a fair profit. We conclude also that GE, by failing to press for AT's continuing participation in the program and by competing for the EM sensor work, committed total breaches of its duties to AT. As a consequence AT was deprived of a valuable opportunity for a part in the program.

3. GE argues that its obligation to AT was at most to negotiate a subcontract and that such an obligation is too uncertain to be enforceable. A purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable. See *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod. Inc.* 283 Mass. 383, 390; *Caggiano* v. *Marchegiano,* 327 Mass. 574, 579; *Jacoby* v. *Koufman,* 344 Mass. 761, 762; *St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.* 235 N. Y. 30, 36; *Sun Printing & Publishing Assn.* v. *Remington Paper & Power Co. Inc.* 235 N. Y. 338, 345–347; *Ansorge* v. *Kane,* 244 N. Y. 395, 398. See also Williston, Contracts (3d ed.) §§ 37–42, 45–49; Corbin, Contracts, §§ 95–102.[17] It is apparent that the detailed terms of AT's subcontract were never determined beyond the expectation that the subcontract would cover the EM sensor and enable AT to recover its costs and a reasonable profit.

Whatever uncertainty may have existed about the subcontract does not preclude recovery by AT. What AT lost

[17] Compare cases where despite some uncertainty a contract has been treated as enforceable. *Silver* v. *Graves,* 210 Mass. 26, 29–30; *Shayeb* v. *Holland,* 321 Mass. 429, 431–434; *Cygan* v. *Megathlin,* 326 Mass. 732, 734; *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 523–525; *Davidson* v. *Robie,* 345 Mass. 333, 337–340. Cf. also *Nassif* v. *Boston & Maine R.R.* 340 Mass. 557, 564–565; *Pillois* v. *Billingsley,* 179 F. 2d 205, 207–208 (2d Cir.).

by GE's breaches of contract was a business opportunity. See e.g. *Spitz* v. *Lesser,* 302 N. Y. 490, 492–494; *Chaplin* v. *Hicks,* [1911] 2 K. B. 786, 791–801. See also Restatement: Contracts, § 332; Williston, Contracts (2d ed.) § 1346; Corbin, Contracts (1964 ed.), § 1030; note, 61 Harv. L. Rev. 113, 123. Cf. *Zephyr Aircraft Corp.* v. *United States,* 104 F. Supp. 990, 996 (Ct. Cl.), cert. den. 344 U. S. 878. The problem is to determine the value of that opportunity to which AT was entitled as a contract right, even if AT's lost profits cannot be ascertained. A reasonable approximation will suffice. See *Agoos Leather Cos. Inc.* v. *American & Foreign Ins. Co.* 342 Mass. 603, 608; *White* v. *Universal Underwriters Ins. Co., ante,* 367, 382. See also *Noble* v. *Joseph Burnett Co.* 208 Mass. 75, 82 ("a fair and equitable share of the net profits" not too indefinite as a basis for an accounting); *Babikian* v. *Brown,* 293 Mass. 195, 200; *Tompkins* v. *Sullivan,* 313 Mass. 459, 462–463; *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377, 378–379; Corbin Contracts (1964 ed.), §§ 1020–1022; Williston, Contracts (2d ed.) §§ 1346, 1346A. Cf. *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.* 344 Mass. 632, 635–636. Particularly is this so where the difficulties in determining damages arise in large part from GE's own failure to negotiate with AT in accordance with the joint undertaking. See *Spitz* v. *Lesser,* 302 N. Y. 490, 494; McCormick, Damages, § 27, pp. 102–103. See also *Story Parchment Co.* v. *Paterson Parchment Paper Co.* 282 U. S. 555, 565; *Bigelow* v. *RKO Radio Pictures, Inc.* 327 U. S. 251, 264–265.

Nevertheless, we do not accept the master's conclusion that AT's unilateral reply (to GE's RFQ) received March 19, 1962, and that dated September 11, 1961, afford a proper basis for determining the value of AT's lost opportunity, or for showing what subcontract AT should fairly have negotiated with GE. Doubtless AT's March 19 and September 11 quotations were made carefully, in accordance with GE's requirements, and "with an eye to competition." They were not accepted by GE, however, and the Air Force might not have approved them. The quotations left unresolved

questions concerning the propriety of AT's estimated costs (see fn. 6) and of its overhead allowances and allocations.[18] More important, the master's computation of damages seems to have been made by allowing to AT the whole of what it would have received (by reimbursement of its costs plus a seven per cent fee) under a CPFF subcontract on the basis of its bids, less the cost to AT of performing such a subcontract. See *Bucholz* v. *Green Bros. Co.* 272 Mass. 49, 54. That computation did not in any degree reflect the potential effect (see fn. 8) of bargaining or the possibility that the Air Force would not have approved such a subcontract without competition. See *Harding* v. *Rock,* 60 Wash. 2d 292, 301–303. Although the damages allowable to AT upon the subsidiary findings could not exceed the amount allowed by the master, we think that the amount of damages can be fairly determined only after due consideration of the uncertainties which affected the value of AT's lost opportunity.

The master or a judge in the Superior Court, on the basis of the subsidiary findings already made and further evidence (including any appropriate expert testimony), must appraise the fair value of AT's lost opportunity in the light of the uncertainties. See analogy of *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 314 Mass. 558, 564–567. This will be largely a matter of judgment, taking into account relevant factors, including what the trier of the fact concludes would have been (1) the approximate net amount realized by AT from a subcontract, if one had been negotiated, and (2) the probability of successful negotiations and Air Force approval.

We think that such an appraisal can be fairly made with adequate certainty. Nevertheless, whatever may be the difficulties in proving damages, the amount of recovery can-

---

[18] Although (1) the master found that the methods "used for determining overhead and profit appear to be in line with Air Force policies," and (2) the subsidiary findings indicate that a conservative basis was used for determining AT's overhead allocations for the fiscal year beginning March 1, 1961, the propriety of overhead allowances would have been a likely subject of discussion in subcontract negotiations. The master appears to have assumed that AT in any event would have incurred (and charged to other contracts) certain indirect and overhead costs, even if AT did not perform the expected subcontract.

not be less than the higher of two available alternative measures of damages viz. (a) the value reasonably expended by AT in the performance of the joint arrangement, and (b) the fair value of AT's contribution to that arrangement.[19]

The bill in equity did not seek recovery on the substantive basis, or, in general, on the theory of damages, which the master's subsidiary findings would justify. The subsidiary findings are not sufficient to enable us, using the present record only, to make a fair determination of the damages. The case must be remanded to the Superior Court to permit amendment of the pleadings to conform to the case established by the subsidiary findings and for further findings (either by a judge or by a master) on the issue of damages.

4. GE contends that Hynes did not have authority to bind GE to give a subcontract to AT. The subsidiary findings amply support the master's finding that Hynes "who was in charge of the 477L program for GE . . . had authority to bind . . . [GE] so far as AT was concerned." Making the joint proposal, which contemplated that AT would supply the EM sensor system, was formal action by GE consistent with the joint undertaking. It confirmed the action of Hynes in arranging for AT to become a "team member." That the prime contract, after negotiations with the Air Force, differed in various respects from the proposal, or that the prime contract was awarded "not on the basis of . . . [GE's] proposal but rather on . . . [GE's] expected performance," did not relieve GE from its duty to AT under the joint arrangement in respect of a prime contract reasonably directly growing out of the proposal. The subsidiary findings establish that this joint arrangement,

---

[19] See, as to the alternative remedy of recovery of AT's reasonably incurred expenses, *Robie* v. *Ofgant*, 306 F. 2d 656, 660–661 (1st Cir.); Corbin, Contracts (1964 ed.), § 1031. See also *Lynch* v. *Culhane*, 237 Mass. 172, 174. See, concerning an alternative restitutional measure of damages (essentially a quantum meruit determination of the value of AT's contribution), Restatement: Contracts, §§ 347, 348, 350; Corbin, Contracts (1964 ed.), §§ 1104–1107, 1109–1110, 1112–1113; Williston, Contracts (2d ed.) §§ 1454, 1455, 1459, 1471, 1478–1482. See also *Cygan* v. *Megathlin*, 326 Mass. 732, 736; *Pillois* v. *Billingsley*, 179 F. 2d 205, 207 (2d Cir.); *Winch* v. *Warner*, 186 App. Div. (N. Y.) 710, 712–715. Cf. *Murphy*. v. *Mitchell*, 254 Mass. 18, 21; *Rizzo* v. *Cunningham*, 303 Mass. 16, 23; *United States* v. *Americo Constr. Co. Inc.* 168 F. Supp. 760, 761–762 (D. Mass.); *Plattenburg* v. *Briggs*, 166 App. Div. (N. Y.) 326, 327–328.

for enlisting the coöperation of AT, was well within the authority which normally would be possessed by one who was leader of the "group charged with responsibility for presenting" GE's proposal. The findings do not suggest that AT knew or had reason to know that Hynes could not arrange for AT's participation as a team member, even if AT's representatives knew that the actual terms of a subcontract would have to be negotiated with GE's procurement staff.

5. AT contends that GE should have been enjoined from supplying or arranging to supply EM sensors to the 477L project. This project was a matter important to the national defence. That GE was selected by the Air Force from a number of firms to receive the prime contract indicates that it was especially capable of carrying out the project. For this reason alone injunctive relief should not be granted. See *Harrisonville* v. *W. S. Dickey Clay Mfg. Co.* 289 U. S. 334, 338. Cf. *Godard* v. *Babson-Dow Mfg. Co.* 313 Mass. 280, 284, 286–288. Even if all the usual aspects of a joint venture had been present, we think an accounting alone would have provided adequate relief. See *Somerby* v. *Buntin,* 118 Mass. 279, 287–288. See also *Berwin* v. *Cable,* 313 Mass. 431, 434–437. With respect to this less formal joint undertaking, substantial redress can be afforded by the payment of money without injunctive relief. Damages, computed on the general basis already indicated to be appropriate, should cover all aspects of the business opportunity of which AT has been deprived, so far as the several elements of damage are reasonably ascertainable.

6. The final decree is reversed. The interlocutory decree confirming the master's report is modified to confirm that report except as it relates to the issue of damages. So far as the master's report relates to the issue of damages, the interlocutory decree is to be vacated. The case is remanded to the Superior Court for appropriate amendment of the pleadings and for the redetermination of damages, in a manner consistent with this opinion. The plaintiff (AT) is to have costs of appeal.

*So ordered.*