WILLIAM J. BURKE *vs*. ROBERT I. LAPPIN & others.

Suffolk.    May 15, 1973. — August 1, 1973.

Present: HALE, C.J., KEVILLE, & ARMSTRONG, JJ.

*Contract,* Of employment, Termination. *Damages,* For breach of
    contract, For deceit. *Conflict of Laws. Evidence,* Cumulative
    evidence, Relevancy and Materiality. *Words,* "Impact."

The term "compensation" in identical formulas for calculating sev-
    erance pay in two employment contracts for a period of two years
    entered into between two affiliated companies and one employee
    meant the total of the employee's compensation for the two years
    under both contracts, rather than his compensation for the two years
    under each contract, where it appeared that each contract provided
    that termination of employment under that contract would result in
    termination of employment under the other, that each contract
    stated that termination of employment under the other contract
    would have the same "impact" under it, and that the contracts were
    entered into as part of a single transaction; and under a provision of
    the formula in each contract that the employer company would pay
    the employee the unpaid balance of his compensation for the two
    years less any amount earned by him during that period from a new
    employment, the amount so earned should be deducted from the
    unpaid balance of his total compensation for that period under both
    contracts, not from the unpaid balance of his compensation for that
    period under each contract. [427-431]
Damages in an action of tort for deceit must be assessed according to the
    law of the State where the deceit occurred. [433]
According to the law of Illinois in which a cause of action for deceit arose,
    the judge in an action for such deceit properly denied the plaintiff,
    who was induced to work for defendant companies by an offer of a
    stock ownership plan and by misrepresentations about the defend-

ants' financial conditions, "benefit of the bargain" damages where such damages were not reasonably ascertainable, and properly allowed the plaintiff in damages only his investment in the stock. [433-435]

The judge in an action for deceit, applying the law of Illinois where the misrepresentations were made, properly denied punitive damages to the plaintiff where he failed to aver in his declaration and to offer evidence that the misrepresentations were willful, wanton and grossly fraudulent. [435-436]

There was no error in an action for deceit in excluding testimony as to what certain corporate stock would have been worth had misrepresentations about it been true, where such projections were easily ascertainable by examination of a stock ownership plan and a forecast of corporate growth, both already admitted in evidence. [436]

In an action for deceit based on misrepresentations concerning stock purchased by the plaintiff in a defendant company employing him, there was no error in excluding evidence of mental suffering and humiliation on the part of the plaintiff caused by his discharge from the employment rather than by the misrepresentations. [436]

CONTRACT AND TORT. Writ in the Superior Court dated October 23, 1967.

The action was tried before *Taveira*, J.

*William T. Conlon & Edward O. Proctor* for the plaintiff.

*Joseph J. Hurley* for the defendants.

HALE, C.J. This is an action of contract and tort which was tried to a judge and jury of the Superior Court. Counts I and II of the plaintiff's declaration were respectively against Langis, Inc., formerly Signal Manufacturing Co. (Signal) and Nippal, Inc., formerly The Shetland Co. Inc. (Shetland) for breach of an employment contract. The jury returned a verdict for the plaintiff for $17,500 on each count. The contract counts are before us on Signal's and Shetland's narrative bill of exceptions. Counts III, IV, and V are in tort for deceit against Robert I. Lappin, Signal, and Shetland respectively. The jury returned a verdict for the plaintiff for $1,275 on each count. The tort counts are here on the plaintiff's outline bill of exceptions.

*The Contract Counts*

Prior to August, 1966, the plaintiff was employed as general manager of the Outdoor Products Division of

Sunbeam Corporation in Chicago. In May of 1966 the plaintiff was approached by the defendant, Lappin, the president of two affiliated corporations, Signal and Shetland, both located in Salem, Massachusetts. Signal was engaged in the manufacture, and Shetland in the sale, of household appliances. Lappin proposed that the plaintiff leave his employment at Sunbeam and accept a position with Signal and Shetland.

Over the next few weeks a series of meetings occurred between the plaintiff and Lappin during which the subject of the plaintiff's prospective employment was discussed and negotiated. According to these discussions, the plaintiff would become an executive of Signal and Shetland ranking second only to Lappin. The contemplated salary for the plaintiff was $50,000. In addition, the plaintiff was to receive an equity position in the companies by purchasing, at a nominal price, shares of a new class of Signal and Shetland stock.

After further negotiations between the plaintiff and Lappin, including the exchange of certain "letters of intent" and contract drafts, the plaintiff entered into separate employment contracts, one with Signal dated August 5, 1966, and the other with Shetland dated August 24, 1966.[1] Each contract provided for an annual salary of $25,000. Both were signed on behalf of the respective companies by Robert I. Lappin, president.

The plaintiff began work under the contracts in September of 1966 as vice-president in charge of marketing for each company. The contracts provided that within one year he

---

[1] Both contracts provide in pertinent part: "2. (a) The employment relationship established under this Agreement shall continue for a period of two (2) years commencing with the effective date of this Agreement, unless terminated by reason of disability or death, or otherwise.

"(b) If the Company shall terminate this employment arrangement during the two year period specified in Section (a) of this paragraph 2, unless such termination shall be by reason of your death or disability (as defined herein), or under the provisions of Section (c) of paragraph 2 or under the provisions of paragraph 7(b), *the Company will pay to you an amount equal to the difference between the balance of your compensation, as herein provided, for such two year term, and any amount which you receive as compensation for services during this period from a new employer. You agree to use your best efforts to secure a new position in this event"* (emphasis supplied).

would become executive vice-president of each. In November or December, 1966, Lappin informed the plaintiff that the financial position of the companies was such that their sale was being considered. On April 3, 1967, the companies were sold to SCM Corporation. That same day the plaintiff was discharged from his employment by letter signed by Lappin as president of a subsidiary of SCM Corporation. In September of 1967, after an intensive and far-ranging search for employment, the plaintiff obtained a position with a company in Minnesota at an annual salary of $37,500.

The parties agree that the severance pay provisions of Section 2(b) of the employment contracts are applicable to the plaintiff's discharge (see fn. 1). The present dispute centers on whether the judge properly charged the jury as to the manner of applying the formula of Section 2(b). The judge's charge to the jury correctly stated that the termination of employment under each contract gave the plaintiff a right to obtain the balance of the compensation under each contract, less any amount that he earned in other employment within the two-year period. The judge further charged the jury that the amount earned by the plaintiff following his discharge, but within the two-year contract period, was to be deducted from the sum of the unpaid salaries of the employment contracts. The defendants excepted to this aspect of the charge, arguing that the two employment contracts should have been treated separately, and, consequently, the plaintiff's subsequent earnings should have been deducted separately from the balance of the compensation due from *each* company, and not from the sum of the two companies' balances. The result of this theory would be that the defendant owed the plaintiff nothing.[2]

---

[2] The following tabulation was furnished by the parties' briefs:

*"Plaintiff's theory* . . . taking the companies together:

| | |
|---|---|
| Two (2) years salary | $100,000 |
| Received before time of discharge | 27,520 |
| Balance of compensation for 2 year period | $ 72,480 |
| Credit plaintiff's subsequent earnings | 38,331 |

While the formula for severance pay provided in Section 2(b) of each contract, standing alone, admits of a clear and precise interpretation, we are concerned with the effect to be given Section 2(b) when read in conjunction with Paragraph 17 of the Signal contract and Paragraph 16 of the Shetland contract.[3]

The apparent intent of the parties, as manifested in the language of Paragraphs 16 and 17, is to integrate so much of the two employment contracts as relates to the termination of the plaintiff's employment. Each contract provided that a termination of employment by one company would result in a termination by the other. The parties also agreed in the Shetland contract "that the termination with Signal shall have the *same impact* upon you and the Company under this Agreement as the impact of such termination upon you and Signal under the terms of the Signal Agreement" (emphasis supplied); the Signal contract contained an identical provision as to the "impact" of Burke's termina-

| | |
|---|---|
| Net compensation | $ 34,049 |
| Divided between the two companies, each | 17,025 |
| "The Court used round figures agreed to by the parties . . . as follows: | |
| Net balance of compensation for 2 year period | $35,000 |
| Divided by the two companies | $17,500 |
| *"Defendants' theory,* taking each company separately: | |
| Two (2) years salary | $50,000 |
| Received before discharge | 13,760 |
| Balance of compensation for 2 year period | $36,240 |
| Credit plaintiff's subsequent earnings | $38,331 |
| "Result — No compensation from either Company." | |

[3] The paragraphs are identical except for their references to the date of agreement and to the corporate name. Paragraph 16 of the Shetland Contract is as follows: "16. In the event that your employment with Signal Manufacturing Co., as reflected in an agreement dated August 6, 1966, as amended by Agreement dated August 24, 1966, is terminated, then your employment shall terminate hereunder. *It is our intent, however, that the termination with Signal shall have the same impact upon you and the Company under this Agreement as the impact of such termination upon you and Signal under the terms of the Signal agreement.* Therefore, the termination effected by reason of the provisions of this paragraph shall be a termination of your employment, in the same manner as your employment with Signal was terminated, as if your employment hereunder was terminated other than under the provisions of this paragraph 16. Without limitation of the foregoing and as an example thereof, if the termination of your employment with Signal is pursuant to Section (b) of paragraph 2 of said Agreement with Signal, then, such termination shall be deemed to apply to the Company pursuant to Section (b) of paragraph 2 of this Agreement" (emphasis supplied).

tion with Shetland (see fn. 3). The scope to be given to the word "impact" is not specified. However, since each contract does specify the effect of employment termination under various circumstances (*e.g.,* death, disability, discharge for moral turpitude), it is clear that the term "impact" in Sections 16 and 17 is meant to include the totality of the consequences of employment termination as provided in the contracts.

The close connection between the contracts of employment is also apparent from other evidence. The preliminary meetings between Lappin and the plaintiff contemplated a single position for the plaintiff in the hierarchy of both companies with an annual salary of $50,000. A draft of a proposed contract provided for the plaintiff's employment by one company, Signal. The correspondence between the parties, including letters of intent and drafts of the employment contracts, made frequent reference to both companies. The provisions of the stock acquisition agreements, designed to provide an equity position for the plaintiff, were similar in their terms, and the provision for such agreements in the letters of intent clearly indicated that they were parts of a single transaction.

Our interpretation of the severance pay formula under Section 2(b) is based in large part upon our conclusion that the plaintiff was employed under contracts substantially identical and executed as parts of a single transaction. *Chelsea Industries, Inc.* v. *Florence,* 358 Mass. 50, 55 (1970), and cases cited. Sections 16 and 17 of the respective contracts indicate that the parties intended that the consequences of the termination provisions in both contracts were to be read together as if the plaintiff were employed by one company. We conclude that the judge properly charged the jury with regard to the severance pay provisions of Section 2(b) of each contract.

### The Tort Counts

During their preliminary discussions, Lappin informed the plaintiff of certain aspects of the financial condition of the Signal and Shetland companies. The material state-

ments and representations made by Lappin which form the factual basis of the plaintiff's action in deceit related to (1) the companies' present and future profitability, (2) the effectiveness of a new materials management system, (3) the availability of substantial excess inventory (valued at one to two million dollars and not entered in the corporate balance sheets) from which greater profits would be derived, (4) the soundness of the companies' accounts receivable and their credit position, (5) Lappin's present intent to maintain a long-term employment relationship for the plaintiff, and (6) Lappin's assurance that he had revealed all the corporate problems.

The plaintiff's participation in a stock ownership plan was also discussed at the preliminary meetings. A new class of Signal and Shetland stock would be created and a percentage of the new stock would be allocated to the plaintiff according to a formula based on total sales volume and profit. During their discussions the plaintiff was also provided with a "Forecast" of corporate growth for 1967-1976 and a financial statement for Signal and Shetland.

In November or December of 1966, after the plaintiff commenced employment with the companies, Lappin informed him that a $500,000 inventory shortage had just been discovered, that sales were not going to reach the volume anticipated, that the cash position of the companies was desperate, and that the sale of the companies was being considered. At this time, the plaintiff concluded that the representations which Lappin had made to him during the period when the two men were negotiating for the plaintiff's services were false.

At the trial, the action in deceit was submitted by the judge to the jury on a single question, "Within the instructions given by the Court was any false representation of existing fact made by Mr. Lappin to Mr. Burke before August 5, 1966?" The jury answered "Yes." The judge then directed the jury to make a finding on each of the deceit counts in the amount of $1,275.[4] The only issues

---

[4] The parties stipulated as to counts III, IV, and V as follows: "The Court having

before us concern the judge's instructions on damages and rulings on the admissibility of evidence.

1. The substantive rights of the parties, including damages, on the tort counts in this action are governed by the law of Illinois, the State where the tort was committed. *Trudel* v. *Gagne,* 328 Mass. 464, 465-466 (1952), and cases cited. *Doody* v. *John Sexton & Co.* 411 F. 2d 1119, 1121 (1st Cir. 1969).

2. The plaintiff requested that the jury be charged on the "benefit of the bargain" theory of damages.[5] The judge refused so to charge, and, instead, ruled that the plaintiff "on the state of the evidence here presented" could not recover under the tort counts any element of damages other than his investment in the stock of Signal and Shetland.

It is true that the law of Illinois allows the plaintiff to recover in damages "the difference between the value of the property as it is and what it would be worth if the representations had been true." *Schwitters* v. *Springer,*

---

ruled as a matter of law, over the exceptions of the plaintiff, that the jury is not entitled to consider as damages any other elements, items or measures of damages upon the evidence in the case, the verdict to be returned on Counts III, IV and V, respectively, shall be in the amount of $1,275.00."

[5] That request was embodied in "Plaintiff's Additional Requests for Jury Instructions" which read in pertinent part:

"*Request No. 2* The measure of damages for deceit in this case is the difference between the total value of the business opportunity Mr. Burke would have had at Shetland and Signal if the representations made to him had been true and the value of the opportunity he actually had.

"*Request No. 3* In determining the value of the opportunity which Mr. Burke would have had if the representations had been true, you may decide, if you deem it fit to do so under the circumstances, that if the representations had been true, Mr. Burke's employment at Signal and Shetland and his ownership of 10% of the Class 'A' stock of those companies would have continued for a period well beyond the end of the first two year period of employment beginning on September 19, 1966. *Air Technology Corporation* v. *General Electric Co.* 347 Mass. 613 (1964).

"*Request No. 4* In determining the value of the opportunity which Mr. Burke would have had if the representations had been true, you may place a value on Mr. Burke's Shetland and Signal stock by a determination of the prospective value of that stock as of that future date which you consider reasonable under the circumstances.

"In placing that value you may consider, if you deem it fit to do so, the prior profit history, any forecast of business volume for the future made, any stated profit objectives and any statements or misrepresentations by Mr. Lappin which related to the future profit or volume course of the companies.

"Also, in placing that value, you should have in mind the formula for evaluating Class A stock set out in writing in Exhibit 18."

236 Ill. 271, 274 (1908). See *Johnson* v. *Niles Invisible Door Check Co.* 222 Ill. App. 65, 68 (1921). Before this rule can be applied to facts such as in the present case, the court must be satisfied that there are sufficient facts from which the probable gain can be estimated with reasonable certainty and without resort to speculation. See *Meyer* v. *Buckman,* 7 Ill. App. 2d 385, 403-404 (1955); *Board of Educ.* v. *United States Fid. & Guar. Co.* 115 Ill. App. 2d 416, 428-429 (1969).

The plaintiff argues that there was sufficient evidence upon which the jury could ascertain "benefit of the bargain" damages resulting from the business opportunity lost by reason of the deceit. We disagree. The stock ownership plan was the vehicle by which the value of the plaintiff's business opportunity would be realized. The value of the stock allocated to the plaintiff under this plan depended entirely upon the companies' ability to generate substantial profits.[6] The success of the plaintiff's stock ownership plan depended upon a greater degree of corporate growth than could be reasonably anticipated by the plaintiff during his negotiations with Lappin.

In support of his contention that "benefit of the bargain" damages are reasonably ascertainable, the plaintiff relies on the consolidated profit statement for fiscal years 1955-1965, particularly the profit ratio to sales of 23.6 percent for the fiscal year ending February 28, 1959. The profit ratios for the other years belie the plaintiff's conclusion that a reasonably certain basis exists for predicting future profitability.[7] See *Durfee* v. *Durfee & Canning, Inc.* 323 Mass.

---

[6] Under the stock agreement, the plaintiff's class of stock would benefit only when the companies' profits exceeded ten percent of their net worth in the first year and fifteen percent in subsequent years. In addition, if the companies sustained a loss in any year, the entire amount of that loss would be charged against the plaintiff's stock.

[7]

| "Fiscal Year Ending: | Profit Ratio to Sales |
|---|---|
| 2/28/55 | 10.5$\%$ |
| 2/29/56 | 9.3 |
| 2/28/57 | 13.7 |
| 2/28/58 | 14.5 |
| 2/28/59 | 23.6 |
| 2/29/60 | 12.6 |

187, 204-205 (1948). Cf. *Rombola* v. *Cosindas,* 351 Mass. 382, 384-385 (1966); *Bigelow* v. *RKO Radio Pictures, Inc.* 327 U. S. 251, 264 (1946). Nor do the representations as to excess inventory and the availability of credit provide such a basis. Moreover, even if improved profit performance can be predicted without speculation, the extent of profitability required before the value of the plaintiff's stock ownership would be realized is highly conjectural.

The inability to make even a reasonable approximation of the lost business opportunity in this case is to be distinguished from the situation in *Air Technology Corp.* v. *General Electric Co.* 347 Mass. 613 (1964), relied upon by the plaintiff. In that case, the plaintiff's business opportunity was embodied in a contract right which it had lost and its claim for recovery could, according to the court, be based on a reasonable approximation of costs incurred in the performance of specified contractual obligations, plus a specific percentage fee. In the present case the value of the business opportunity lost depends on a prediction of sizeable profits in the future which cannot be grounded in either the record of past performance or even the hypothetical truth of Lappin's representations. We conclude that the judge properly rejected the "benefit of the bargain" as a measure of damages in this case.

3. The plaintiff next contends that the judge erred in denying his request for an instruction permitting the jury to assess punitive damages. Punitive damages can be recovered under Illinois law if the deceitful representations were willful, wanton and grossly fraudulent. *Laughlin* v. *Hopkinson,* 292 Ill. 80, 89 (1920). *Hannigan* v. *Sears, Roebuck & Co.* 410 F. 2d 285, 293 (7th Cir. 1969). The record in the present case is bereft of any evidence that the deceit was of

| 2/28/61 | 7.0 |
| 2/28/62 | 9.7 |
| 2/28/63 | 8.7 |
| 2/29/64 | 4.4 |
| 2/28/65 | 6.2" |

that character. Moreover, the plaintiff failed to aver in his declaration that the actionable misrepresentations were willful, wanton or grossly fraudulent. See *Kilduff* v. *Boston Elev. Ry.* 247 Mass. 453, 456 (1924); *Roketenetz* v. *Woburn Daily Times, Inc. ante,* 156 (1973); *Taneski* v. *St. Louis Merchants' Bridge Terminal Ry.* 230 Ill. App. 300, 304 (1923); *Kimes* v. *Trapp,* 52 Ill. App. 2d 442, 448 (1964).

We conclude at this point that the judge properly limited the plaintiff's recovery to his out-of-pocket losses, *i.e.,* the amount invested in the stock.

4. The plaintiff excepted to the judge's exclusion of testimony proffered by the plaintiff on redirect examination as to what his Signal and Shetland stock would have been worth at the end of the fiscal years ending February 28, 1967, through February 28, 1971, based upon certain assumptions of sales volume and profits. An offer of proof was made during which the plaintiff's counsel indicated that his purpose was to rebut the matters raised in cross-examination as to the speculative nature of the stock value. The projections which the plaintiff's attorney sought to introduce were easily ascertainable through an examination of the stock ownership plan and a forecast of corporate growth, both of which had been admitted in evidence in direct examination. The judge recognized this consideration when he told counsel that any projections could be made in final argument based upon evidence already admitted. No further computations by the plaintiff were necessary.

5. The plaintiff excepted to the judge's exclusion of evidence of the plaintiff's mental suffering and humiliation. All of the plaintiff's alleged mental suffering resulted from his discharge under the employment contracts. It was not the proximate result of the defendant's fraudulent misrepresentations. See *Ellis* v. *Brockton Publishing Co.* 198 Mass. 538, 543 (1908); *Szpiro* v. *Corkin,* 340 Mass. 260 (1960).

> *Defendants' exceptions overruled.*
> *Plaintiff's exceptions overruled.*