Board of Education, School District No. 90, Cook County, Illinois, for the Use and Benefit of Fenestra, Inc., Plaintiff, v. United States Fidelity & Guaranty Company, a Corporation, and Anko Construction, Inc., a Corporation, Defendants.
Anko Construction, Inc., Counterplaintiff, Appellee, v. Fenestra, Inc., Counterdefendant, Appellant.

**Gen. No. 52,574.**

First District, Fourth Division.

October 15, 1969.

417

Spray, Price, Hough & Cushman, of Chicago (James T. Otis and John R. F. Baer, of counsel), for appellant.

Howard Hoosin, of Chicago, for appellee.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Board of Education, School District 90, Cook County, Illinois, for the use and benefit of Fenestra, Inc., brought this action against United States Fidelity and Guaranty Company and Anko Construction, Inc., on a performance bond to recover a balance due of $4,985.25 for materials and labor furnished in the construction of an addition to a school building. Anko counterclaimed against

Fenestra, alleging that the latter had breached its subcontract agreement with Anko, thereby causing Anko to be relieved of its duties as general contractor on the project and to lose its expected profits. The jury returned a verdict of $4,985.25 in favor of the School District for the benefit of Fenestra on the complaint, and a verdict of $55,000 for Anko on its counterclaim against Fenestra. The trial judge entered judgments on the verdict, and denied the post-trial motions of Fenestra. Only Fenestra appeals from the judgment on the counterclaim and the denial of its post-trial motions. Fenestra raised several issues in its brief, but at oral argument its counsel stated that its only points on appeal were that the verdict was against the manifest weight of the evidence and that the damages were speculative.

Anko was the general contractor on the school addition, and Fenestra as subcontractor was to provide a standard curtain aluminum wall, aluminum windows and a steel sheet roof deck. After testimony was received concerning Fenestra's suit against Anko, the following is a summary of the evidence received on the counterclaim.

Anthony Antoniou, secretary of Anko, testified on behalf of Anko that he had formed the company with George Kouros in 1954. Originally engaged in design work, the company became involved in commercial construction, and by 1958, had built several schools. In January, 1958, he wrote to the architects, Cone and Dornbusch, requesting an opportunity to bid on a proposed addition to Roosevelt Junior High School. Anko signed a contract in May, 1958, and after approval by the architects, the contract was accepted by the Board of Education District 90 in June, 1958. Anko was to be paid about $240,000. Estimates of the total costs were $196,000, and the estimated profit to Anko was to be $44,000. Anko was to finish the job in 175 working days. After signing the contract, Anko selected the critical contracts, those which

419

had to be let immediately. Fenestra was such a subcontractor, and this was the first contract let by Anko. The architects, in their plans, specified Fenestra as a subcontractor; Anko did not have a choice as to this subcontract. Immediately after the contract had been accepted by the School District, the witness contacted agents of Fenestra, and discussed delivery dates. Fenestra was to deliver the wall and windows September 1, 1958 and erect them by October 1. Fenestra officials said there would be no problem in delivering the wall in September. This was a critical part of the contract. The Fenestra curtain wall consisted of at least two-thirds of the outside of the building. The wall should have been delivered and erected in 70 working days. After the site had been established, Anko broke ground about June 10 or 15; the excavation and foundation proceeded normally. Within 70 working days Anko had the roof steel up, and was ready to receive the wall and deck from Fenestra.

During this period, Antoniou complained to Fenestra's agents by phone that he had not received shop drawings, and he did not receive the drawings until late September. In November, 1958, along with a representative of the architects, he went to Fenestra's offices in Philadelphia, where the curtain wall was to be constructed. He was told that Fenestra was so overwhelmed with orders that the curtain wall would not go into construction until the latter part of January, 1959, and would not be ready until February. Efforts to get an earlier construction failed. The curtain wall was delivered on 3 dates; mid-January, February and March or April. Because of a defect in the first delivery of curtain wall delivered in January, the glazing cracked. After the defect was discovered, new parts of the wall had to be obtained, and the wall was reerected in late March or April. Fenestra's promise to deliver the windows in Jan-

uary was not kept. There were 3 deliveries of windows; one in January, one in March, and the final one in August, 1959. The roof decking for the main building was not delivered until late November, and was erected in December, 1958. The roof decking for the corridor was delivered in the summer of 1959. Anko started to receive complaints in late 1958; prior to that, its relations with the school board and the architects were good. In January, 1959, Anko received complaints from the school board that the building was too cold. Anko had enclosed it as best it could in order to work inside, but the roofing could not go on because of the lack of metal decking. The project was to be completed in January, 1959; it was not completed until the fall because of the late delivery of the windows and curtain wall. Anko completed about 90 to 95 percent of the work. There was no penalty clause in the contract between Anko and Fenestra. The witness was unable to explain why the roofing could not be put up for lack of the curtain wall unless he could see the detailed blueprints. As of October, 1958 the structure was ready to receive the curtain wall and decking. Anko spent $9,000 to temporarily enclose the building in December. The school board was not charged for this extra cost, because Anko expected to sue Fenestra for that cost. There was some delay prior to September, but it was not substantial. There was also some delay caused by other subcontractors.

George Kouros testified in behalf of Anko that he ran the office for Anko until June, 1959, at which time he took over as field supervisor of the project in question. The reason for the delay in completing construction was Fenestra's delay in delivery, which was a minimum of four or five months. The contract price was approximately $240,900, and Anko's anticipated profit was about 15 percent of that price. That would be $36,000. In addition to that amount, Anko expected a profit of $6,000 to

$7,000 for subcontract work it did on the job. Thus the total expected profit was $42,000 to $44,000.

Loss of profits began in November, 1958, and was caused by delays, damage by the elements, and length of time for completion. Because of extras, Anko's final bill to the school board was $265,000. Anko was paid $207,-000 by the board. When Anko left the job in October, 1959, it had an out-of-pocket loss of about $60,000 caused by Fenestra. After this job, Anko could not get bonded, and went out of business in 1959 or 1960. During this job, Anko had to sandblast and repaint the corroded wall, caused by exposure to the elements. This was due to the Fenestra delay, and cost between $4,000 and $6,000. Anko had difficulty with all the subcontractors, because they were all experiencing losses. There was an extensive amount of rain in the summer of 1959. Anko did everything in its power to run the job efficiently. The witness did not recall if Anko ever alleged that the faulty work of the masonry contractor caused the delay; nor did he remember if Anko alleged that other subcontractors caused delays. The school board had extended the date of completion several times. At the end of July, 80 percent of Fenestra's work was completed. In 1957, Anko made a profit of $40,000; in 1958, it had a loss of $16,000; and in 1959, it lost about $12,000. During this job, it had an overhead of $30,000 to $45,000 attributable to this project. Anko's books and records were turned over to the Goettsche accounting firm.

Kermit Medlock testified in behalf of Anko that he was presently employed by Anvan Corp., owned wholly or partially by Antoniou. He was construction superintendent for Anko at the time of the job in question. He supervised personnel and trades. There was no major delay on the job prior to October, 1958. At that time, they were waiting for the roof deck and curtain wall. Men were idle, and material was damaged because of the

delay. Steel had to be sandblasted and repainted. The plastic sheathing erected for protection did not do much good. The curtain wall was finally completed in March, 1959. In June, 1959, about 75 percent to 80 percent of the job was done, and the remainder should have been completed in two months.

Wallace Sugden testified in behalf of Fenestra that he was superintendent of the River Forest Public Schools during the years 1958 and 1959. The original contract between the school board and Anko called for a completion date of 175 working days. This would have meant completion in January, 1959. It was not completed at that time, and Anko was granted several extensions, one until March, another until June, and a third until August. Anko never completed the construction, and the job was completed by Weigert Company. When Anko left the job, between $40,000 and $50,000 was due from the school board. Anko did not work regularly on the job during the summer of 1959, and did not try to complete the job that summer.

Carlyle Joye testified for Fenestra that he was in charge of the erection of Fenestra materials during 1958 and 1959. He saw the final approved shop drawings pertaining to this job in September, 1958. The schedule for the manufacture of this curtain wall was sixteen weeks after receipt of the drawings. The roof decking took four to six weeks to manufacture. Before either could be erected, the structural steel had to be in place. The job site was ready for the curtain wall in January, 1959, and the wall was installed in January, February and March. The roof decking was installed in February, and the windows were installed in July. The job site was not ready for the erection of the curtain wall until January because the structural steel was not in place. However, after looking at a list of invoices, the witness testified that, according to the invoices, all the

structural steel had been delivered by October 7. When he testified that the site was not ready to receive the wall and decking until January, he meant that it was necessary to sandblast and repaint the steel which had been erected. There were some defects in the horizontal members of the aluminum, and it was corrected by Fenestra in February. Anko complained about the delay in delivery of the curtain wall and decking.

Spencer Cone, a partner of Cone and Dornbusch, architects on the job, testified for Fenestra that Anko was the low bidder, and received the contract. School construction is competitive, and the profit margins are low. His opinion as to the usual profit margin was that it would be 6 or 7 percent. The original completion date on the job was January or February, 1959, and was extended several times. The job did not progress normally from the time ground was broken in June, 1958. The contract was finally terminated because of Anko's general incompetence and disregard of the specifications, culminating in close to a year's delay. Anko was incompetent in providing a temporary enclosure and in leaving dangerous conditions unguarded. There was a substantial delay in excavation, and almost all materials arrived late. There was a delay in pouring the foundation, and part of it had to be redone. Total delay was caused by Anko. Although Fenestra was late in its delivery, the structural steel was probably two or three months behind schedule. Anko did not have a choice in hiring Fenestra as a subcontractor. Under its contract, Anko could request a substitution of subcontractor from the school board and architect. Anko made such a request with respect to Fenestra, but it was denied.

Dale Floyd, president of a steel erecting company, testified that his company erected steel on this job, and in 1959 sued Anko for nonpayment.

Roger Goettsche, a member of a firm of certified public accountants, testified that his firm had never had in its possession the books and records of Anko.

Fenestra first contends that the verdict was against the manifest weight of the evidence.

 A verdict which is based upon conflicting evidence and approved by the trial court can be set aside only when it is against the manifest weight of the evidence. Thus a verdict and judgment will be set aside only where it is clearly evident that the jury has arrived at an incorrect result. Frozen Food Express v. Modern Truck Lines, Inc., 79 Ill App2d 84, 223 NE2d 275 (1967); Cochran v. Parker, 91 Ill App2d 56, 233 NE2d 443 (1968). As stated in Whitman v. Prescott, 80 Ill App2d 49, 225 NE2d 384 (1967) at p 58,

> "The law is well settled in Illinois that a reviewing court cannot substitute its judgment for that of a jury in passing on the weight of the evidence. The trial judge who saw and heard the witnesses may, in his sound discretion, grant a new trial if the jury's verdict is contrary to the preponderance or weight of the evidence. . . . A reviewing court may overturn a jury's verdict only if it is contrary to the manifest weight of the evidence. By manifest weight is meant the clearly evident, plain and indisputable weight. Black v. DeWitt, 55 Ill App2d 220, 204 NE2d 820."

In applying these general rules of law to the facts in the instant case, we find that the verdict was not against the manifest weight of the evidence.

 Fenestra argues that the evidence clearly demonstrated that it caused no delay; that if it did cause a delay, Anko contributed to that delay, thereby barring recovery; that Anko waived any delay by urging per-

formance from Fenestra; and that termination of the contract was not caused by Fenestra's delay, but by the general incompetence of Anko. However, there was conflicting testimony presented at trial regarding those issues, and we cannot say that the finding by the jury in favor of Anko was against the manifest weight of evidence.

According to the contract, Fenestra was to deliver the curtain wall upon completion of the structural steel without delays, and the evidence reveals that this was not done. Anko presented evidence that there were no substantial delays during the initial stages of construction, that the job proceeded normally until time for Fenestra's performance of its contractual obligations, and that it was ready to receive the curtain wall by October. Even the architect, who testified for Fenestra, conceded that Fenestra was probably late in its delivery of the curtain wall.

Fenestra's argument that Anko contributed to the delay by failing to deliver the approved shop drawings in time is not supported by the record. Fenestra was obligated to ship the curtain wall whenever Anko was ready for it. Nothing in the evidence indicated that Anko was to forward the drawings by a certain date. Nor was Anko made aware that Fenestra could not make delivery of the curtain wall without receipt of the drawings. The jury could reasonably conclude that it was Fenestra's responsibility to obtain the necessary specifications to fulfill its contract. Moreover, Antoniou testified that he complained of Fenestra's delay in furnishing him the preliminary shop drawings, that he did not receive the drawings until late September, and that when he personally visited the Fenestra plant in November, he was informed that the curtain wall was not yet in construction because Fenestra was overwhelmed with orders.

█ Fenestra also argues that Anko waived any delay by continuing to urge completion of the curtain wall and

426

performance of the contract. It is true that delays in performance of a contract may be waived by conduct indicating an intention to regard the contract as still in force and effect. Peterson Steels v. Seidmon, 188 F2d 193 (7th Cir 1951). However, as stated in Snell v. Cottingham, 72 Ill 161 (1874), at p 171:

> "Appellants, with great propriety and consistency, could urge the contractors to finish the work under the contract, and afterwards accept it. All they would waive in such case would be the performance on a fixed day, but nothing else. The contractors might recover for the work done on a quantum meruit, but appellants would have the clear right to insist upon and recoup such damages as they may have sustained by reason of the non-compliance with the contract, if the delay was not caused by their default."

Accord, Felt v. Smith, 62 Ill App 637 (1895).

■ In the instant case, Anko continually complained of Fenestra's delay. By contract with the school board, it was compelled to accept Fenestra as a subcontractor. It sought permission from the board and architects to replace Fenestra. That request was denied. Thus, it had little choice but to accept Fenestra's delayed performance. Assuming, without so finding, that there was a waiver as to the time of performance, Anko's right to sue for damages was not waived.

In arguing that the total delay was caused by Anko's inefficiency and incompetence, Fenestra relies on the testimony of its witnesses, particularly the architect, that there were delays in the initial stages of he job; that Anko was inefficient; that it could not secure cooperation of the subcontractors; that it did not attempt to complete the job in the summer of 1959; and that the total delay was Anko's fault. However, Anko's witnesses testified that everything proceeded normally until Fenestra failed to perform. There was a direct conflict in

the evidence as to whether total delay was caused by Anko's incompetency or Fenestra's failure to perform on time, and we cannot say that the jury's determination of that conflict was against the manifest weight of the evidence.

Cases cited by Fenestra are not controlling. In Ahmer v. Peters, 17 Ill App2d 113, 149 NE2d 503 (1958), the delays complained of were at the request of the plaintiffs, whereas in the instant case there is no evidence of Anko requesting any delays. In Guaranty Iron and Steel Co. v. Leydon, 235 Ill App 191 (1924), the trier of facts found that the general contractor breached his duty in failing to have the building ready to receive further work, whereas in the case at bar, an opposite conclusion was reached by the jury.

Fenestra's second contention is that Anko failed to offer any competent evidence of damages, and that therefore damages were speculative. We do not agree.

■ ■ Profits are not recoverable without some evidence as to amount, and must be proved with a reasonable degree of certainty. Falejczyk v. Meo, 31 Ill App 2d 372, 176 NE2d 10 (1961). One willing to perform a contract but prevented from doing so may show his loss of anticipated profits, unless they are too remote and speculative. Gist v. Wyoming Land and Irrigation Co., 208 Ill App 202 (1917); ILP, Damages, § 241.

In Meyer v. Buckman, 7 Ill App2d 385, 129 NE2d 603 (1955), the court, in holding that anticipated profits had been sufficiently proved, stated at p 403:

> "A recovery may be had, in a proper case, for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty; absolute certainty as to the amount of loss or damages in such cases may not, ordinarily, be attainable, but that is not required to justify

recovery; all the law requires is that it be approximated by competent proof; that proof of the exact amount of loss may be impossible does not justify refusing compensation; in cases of this character all the law requires is that the evidence shall, with a fair degree of probability, tend to establish a basis for the assessment of damages: Barnett v. Caldwell Furniture Co. (1917), 277 Ill 286."

In the instant case, the verdict and judgment of $55,000 against Fenestra was based upon adequate evidence. Anko offered testimony that as general contractor it expected a 15 percent profit on its bid of $240,-900 on the project, or about $36,000. In addition, it expected a profit of $6,000 to $7,000 as a subcontractor for work performed on the job itself. This would constitute a total profit of $42,000 to $43,000. Fenestra concedes that the contract price is accurate, but argues that Anko's expected 15 percent profit was unrealistic. At trial it presented the architect's testimony that a 6 percent profit would be proper in such a construction contract. This testimony presented a factual conflict as to the anticipated profits, and the conflict was properly resolved by the jury.

Fenestra cites the case of Salaban v. East St. Louis and Interurban Water Co., 284 Ill App 358, 1 NE2d 731 (1936), for the proposition that an estimate of profits by interested winesses, such as the officers of Anko, does not constitute such evidence as will support a judgment for damages. In the Salaban case, a restaurant and rooming housekeeper had a dispute with a public utility which supplied water. As a result of the dispute the utility refused to furnish the plaintiff water for a few months. The plaintiff claimed his business was damaged because of this refusal. The court said that he had laid no foundation upon which damages could be based,

since the only evidence was his own testimony that he sometimes made as much as $350 a month from his business, and that such proof was inadequate. However, in Meyer v. Buckman, supra, the court upheld the proof of damages, where the plaintiff was the only witness to testify as to his prospective profits. And in Capitol Paper Box, Inc. v. Belding Hosiery Mills, Inc., 350 Ill App 68, 111 NE2d 858 (1953), the court held that the testimony of the president of plaintiff corporation was sufficient to sustain a recovery for loss of profits. In the instant case the testimony of Anko's corporate officers afforded a sufficient basis by which the probable profits could be estimated with reasonable certainty.

■■■ Over and above the loss of profits, Anko presented evidence that, because of Fenestra's delay, it was compelled to expend $9,000 to temporarily enclose the structure and to pay $4,000 to $6,000 to sandblast and repaint the structure. While contending that these expenses were not due to its delay, but to Anko's incompetency, Fenestra did not dispute these expenditures, and in fact, presented evidence that the steel had been sanded and repainted. These additional expenditures were proper elements of damages to be considered by the jury, along with the loss of profits. Taken together they amounted to between $55,000 and $58,000. There was also testimony on behalf of Anko that there was a difference of $58,000 between Anko's final bill and the amount paid by the School Board. Fenestra's witness, the school superintendent, also stated that between $40,000 and $50,000 was due Anko. On the evidence we find that there was a proper basis for the amount of the verdict, and that damages were not speculative.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

DRUCKER, P. J. and STAMOS, J., concur.