ROYAL ORNAMENTAL IRON, INC., Plaintiff and Counterdefendant-Appellant, v. DEVON BANK, as Trustee, et al., Defendants and Counterplaintiffs-Appellees.

(No. 58253;

First District (3rd Division)—September 4, 1975.

102

Yaffe & Yaffe, of Chicago, for appellant.

Jay Erens, William E. Rattner, and Roger L. Price, all of Levy and Erens, of Chicago, for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Royal Ornamental Iron, Inc., an Illinois corporation (Royal), commenced an action to foreclose a mechanic's lien on real estate owned by Devon Bank, as trustee under Trust No. 1237 (Devon Bank). Defendants answered the complaint and Devon Bank filed a counterclaim against Royal for alleged breach of contract. At trial, plaintiff Royal waived its claim for lien and sought a money judgment upon its contract. Following a trial without a jury, judgment was entered against plaintiff Royal, dismissing its complaint with prejudice and awarding judgment against it in favor of Devon Bank on the counterclaim in the sum of $17,710. Plaintiff has appealed from the judgment. The central issue is whether the judgment is contrary to the manifest weight of the evidence.

Plaintiff is in the ornamental iron business. Devon Bank holds title to the real estate in Lincolnwood, Illinois, under an Illinois land trust. The beneficial interest in the trust is owned 50 percent by defendant Marshall D. Leib and 50 percent by Toulin, Inc. Devon Bank, as owner of the real estate, undertook to construct a bank and office building which was to consist of a basement, a ground floor and mezzanine to be occupied by the Bank of Lincolnwood, and a multistory office tower to be occu-

pied by others. No general contractor was employed or involved. Leib was the architect in charge of construction.

On September 22, 1965, Royal entered into a written contract with Devon Bank, executed by Leib and Toulin as its agents, wherein Royal agreed to furnish and install specified ornamental and other work of metal. The contract provided that Devon Bank pay for the performance of the contract the lump sum of $15,500, with further itemization of the work and prices (excluding alternates not applicable here) as follows:

Breakdown of Prices:

| | |
|---|---|
| Stairwell # 1 | $5,000.00 |
| Stairwell # 2 | 3,600.00 |
| Stairwell # 3 | 550.00 |
| Stairwell # 4 | 300.00 |
| Stairwell # 5 | 400.00 |
| Stairwell # 6 | 400.00 |
| Ornamental Railing and gate at roof garden | 1,150.00 |
| Ladders (all) | 300.00 |
| Railings in Bank area | 2,700.00 |
| Aluminum grating over electric vault | 1,000.00 |
| Woven wire partition at elevator penthouse | 100.00 |
| Total | $15,500.00 |

Alternates:

* * *

The relevant terms and provisions of the contract documents include:

(1) "At the earliest date after signing of contract, the Architect shall present an 'Operations Schedule' setting up sequence of operations and time table for each principal item of new work . . ."; the schedule "shall be furnished as a guide . . . and shall be binding on them [the contractors] in their respective works; Failure to maintain schedule . . . shall constitute default";

(2) Payment to each contractor shall be made on monthly certificates (up to 90% of the value of the work in place and of materials suitably stored on the site; except when so certified by the Architect, the Owner shall have the right to withhold payment to a contractor);

(3) Work is to commence immediately upon signing the contract or as required by the Architect's work schedule so that the building can be completed by July 14, 1966; and

(4) If a contractor persistently or repeatedly refused to supply sufficient labor and/or materials for proper progress or to correct

work rejected by the Architect, then, upon certification by the Architect, the Owner may, upon five days' written notice to the contractor, charge the same with his pro rata share of damages, such as rent loss, financing interest and carrying charges incurred, for the length of time such delinquency continues.

Devon Bank in its counterclaim sought damages by Royal's alleged delay in performance and also, by way of setoff against the contract amount, credit for expenditures made to correct and complete Royal's work under the contract. Royal claimed that it was entitled to recover the contract amount less credits for work not done or done incorrectly. It alleged and presented evidence that although Devon Bank breached the contract by failure to pay its invoices when due, and failure to submit an operations schedule, Royal substantially performed its obligations under the contract.

Although there is evidence to show that the work completed by Royal was in some respects defective and incomplete, it clearly shows that all of the work specified was completed by August 11, 1966, with the exception of aluminum grating and woven wire partition, which were not installed by Royal.

No operations schedule was received by Royal. The construction had progressed to the point where on February 26, 1966, Royal could commence fabrication of the stairs and was so notified within a few days. Shop details were prepared by Royal and submitted to Leib who approved them on March 15, 1966. Stairwell No. 2 was installed in mid-April, and stairwell No. 1 was installed by mid-May of 1966. Due to defects, stairwell No. 1 was not completed until approximately July 22, 1966. The evidence shows that stairwells Nos. 3, 4, 5 and 6 had been installed by June 30, 1966. The evidence further shows that the remaining items, except for the aluminum grating and woven wire partition, had been installed between August 1 and August 11, 1966.

Witnesses for Devon Bank testified that stairwells Nos. 1 and 2 would have been fabricated within 2 to 3 weeks after field measurements had been taken. In its brief Devon Bank argues that the delay in that installation "was of great significance to the progress of the job" in that failure to have stairs in place constituted a safety hazard to other contractors and personnel. Witnesses for Devon Bank further testified that the installation of the stairs was defective. The evidence shows that although certain defects were remedied by Royal, others were remedied by Devon Bank. Witnesses for Devon Bank further testified that although stairwells Nos. 3, 4, 5 and 6 were installed, certain defects had to be remedied after installation.

As to the roof railings and gate, witnesses for Devon Bank testified

that these items could have been installed as early as the end of May 1966; that installation was not completed until between August 1 and August 11, 1966; that Royal had previously been requested to install these items (no date was specified as to the requests); and that the failure to install these items within the "construction schedule" prevented the roofers from completing their work which in turn prevented any finishing work to be done on the inside of the building. On August 1, 1966, a memorandum was sent by the architect to Royal advising that the railings had to be installed by August 8 because the roofers were coming on the job.

As to the ornamental railings in the Bank area, witnesses for Devon Bank testified that this phase of the contract should have commenced by February 26, 1966, when the concrete and structural steel were in place; that those railings which were installed were in place by approximately May 15, 1966; that they were defective and had to be removed or repaired, and were finally installed by another contractor; and that the windows were not installed until after the railings were in place which delayed completion of the building. However, there was no testimony as to when the windows were finally installed. Although witnesses testified that Royal was orally notified of the defects, no dates were specified. A copy of a telegram from the architect to Royal, dated May 19, 1966, was introduced into evidence. It stated that the railings on the mezzanine level were rejected and Royal was requested to immediately remove and replace them as the window wall was to be set the following week. There was no evidence that the defective railings which were installed prevented the placement of the windows. Royal admitted that it did not install all of the railings prior to the termination of its contract.

Witnesses for Devon Bank further testified that the aluminum grate over the electrical vault could have been installed immediately after the execution of the contract; that the transformer was delivered and installed and the main cables attached by the end of July 1966; that the grate was never delivered or installed by Royal; and that as a result only a minor power source was available to other subcontractors, and the delay prevented the owner from activating elevators, air-conditioning equipment, heating equipment, and testing other items in the all-electric building. Although Leib testified that many communications were had with Royal concerning the grate, no dates were given. In a memorandum of August 1, 1966, to Royal, the architect stated that it was ready to turn on the electricity and requested Royal to install the grate on the vault. In a memorandum dated August 2, 1966, from the architect to Royal, an employee of the architect referred to a telephone conversation with Royal on the previous day at which time Royal advised that it expected

to receive the grate by the last week of August. The memorandum advised that since no action had been taken on the architect's requests, and the electricity was needed immediately, temporary grates were ordered; that completion of the contract was requested by August 10, 1966, and that failure to do so would result in the assessment of liquidated damages in the amount of $350 per day for delay. In another memorandum to Royal on the same date and by the same employee of the architect, Royal was advised that an order for a temporary grate was placed; the electricity was to be turned on by August 8, and that Royal was requested to install the grate on that date.

The following documents directed to Royal were also admitted into evidence: a telegram dated April 4, 1966, stating that progress on the stairs was falling behind; a letter dated April 5, 1966, stating that the withdrawal of Royal's personnel from the job necessitated the tender of 5 days' notice to work or the owner would employ another contractor; a memorandum from the architect's office, dated May 17, 1966, stating that stairwells 1 and 2 needed to be reworked, and requesting that the other stairs be installed; a telegram from the architect, dated July 7, 1966, demanding that Royal be on the job the next day; a memorandum from the architect's office, dated July 16, 1966, requesting Royal to have its phase of "Bot. L. Completed By 7/30/66"; a memorandum from the architect's office, dated July 25, 1966, demanding completion of its entire contract by August 3, 1966, and stating that liquidated damages in the amount of $350 per day would be assessed for delay; also a letter from the architect and a telegram from the architect as agent for Devon Bank, both dated August 5, 1966, notifying Royal of the owner's intent to terminate the contract if Royal's work according to the contract was not completed within 5 days. Other documents admitted into evidence will be discussed later.

Although Royal by mid-May of 1966 had sent the architect invoices for stairwells 1 and 2, totaling $6,800 ($1,800 less than the contract price), the first and only money received by Royal on the contract was a check paid on June 21, 1966, in the amount of $4,135.32. On June 30, 1966, Royal submitted a bill to the architect for $1,650 (less than the contract price) for completion of stairwells 3 through 6, for which no payment was received. On August 11, 1966, Royal billed the architect $2,875, the full amount for the iron railing on the roof; $225 of the $300 contract price for ladders (Royal admitted failure to install one such ladder); and $1,500 of the $2,700 contract price for railings in the Bank area. No invoices were submitted for the aluminum grating and the woven wire partition, which items were not completed by Royal. No payments were made on the August 11, 1966, invoices.

Royal's contract was terminated on August 12, 1966. On August 23, 1966, Leib authorized Great Lakes Structural Steel Co. (Great Lakes) to complete Royal's contract. On September 22, 1966, Great Lakes agreed to complete the contract and commenced work on or about October 22, 1966. On April 13, 1967, a check was issued to Great Lakes in the amount of $8,297.14 for work completed. This amount, as admitted by Devon Bank, included payment for other work unrelated to Royal's contract. No evidence was presented as to the exact date when construction of the building was completed. Although various bills for completion and correction of Royal's work were admitted into evidence, it is apparent that the trial court did not consider those items as a setoff against plaintiff's claim.

■■ Royal claims that it is entitled to recover for the work furnished under the contract, subject to any deductions by Devon Bank by way of setoff for completing and correcting the work. We agree. In *South Beloit Electric Co. v. Lar Gar Enterprises, Inc.* (1967), 80 Ill.App.2d 367, 375, 224 N.E.2d 306, the court held that where it appears a contractor has in good faith partially performed the contract and the owner has received the benefits of the performance without payment thereof, it would be unjust to deprive the contractor of the amount of such benefits less any damages suffered by its failure to complete the contract. Devon Bank maintains, however, that Royal did not substantially perform its part of the contract. It is argued that substantial amounts of money were expended to correct and complete Royal's contract. Substantial performance is not determined in all instances by calculating the cost necessary to remedy the defects or complete the work. Nor is substantial performance in all instances determined by applying a definite percentage figure to the contract price and calculating to ascertain if the contractor had performed services and supplied labor in value in excess of such percentage price. In the instant case, the materials supplied and the labor furnished by Royal were retained by the owner, Devon Bank. The labor and materials were not discarded by the owner because of total uselessness, nor was a disproportionate sum of money used to remedy the defects and complete the work. Devon Bank received and retained a substantial part of the work that Royal had agreed to perform. (*Errant v. Columbia Western Mills* (1915), 195 Ill.App. 14 (abstract opinion).) As stated in *Spiro v. Cable* (1928), 248 Ill.App. 343, 349, even if the contractor had breached the contract but had in good faith partially performed the terms and conditions of the contract on his part, and the other party had received the benefit of such partial performance, "still the law is not so unjust as to permit the defendant to obtain the benefit of the labor and material furnished by the plaintiff under the contract

without payment therefor." In the instant case, Royal had completed all of the work itemized in its contract except for handrails for stairs Nos. 1 and 2, one ladder, some of the railings in the Bank area, the aluminum grating over the electric vault, and the woven wire partition. While substantial performance by Royal will prevent Devon Bank from avoiding the contract, Devon Bank in turn must be allowed a credit as compensation for the deficiencies in Royal's performance. (See *Broncata v. Timbercrest Estates, Inc.* (1968), 100 Ill.App.2d 49, 52, 241 N.E.2d 569.) The measure of damages is the difference between the total reasonable cost of securing performance and the contract price. (*Ross v. Danter Associates, Inc.* (1968), 102 Ill.App.2d 354, 371, 242 N.E.2d 330.) Inasmuch as unit prices are specified in the contract for the particular items of work to be performed, we see no difficulty in the trial court's ability to compute the proper credit allocable to each item.

Devon Bank, the defendant here, also sought damages from plaintiff Royal for the alleged delay in completing the construction. As stated in the early decision of *Underwood v. Wolf* (1890), 131 Ill. 425, 23 N.E. 598, a party who fails to complete a contract within the specified time will be held liable in damages for the delay. See *Sperry v. Fanning* (1875), 80 Ill. 371.

● 3 In *Board of Education v. United States Fidelity Guaranty Co.* (1969), 115 Ill.App.2d 416, 253 N.E.2d 663, the court held that delays in performance may be waived by conduct indicating an intention to regard the contract as still in force and effect. In the instant case, after stairs 1 and 2 were put in place, Devon Bank made a partial payment to Royal and did not raise any question as to delay. Under such circumstances, Devon Bank waived any claim to damages for delay at least as to that caused by any failure to complete stairs Nos. 1 and 2. (See *Bloomington Hotel Co. v. Garthwait* (1907), 227 Ill. 613, 81 N.E. 714.) However, upon examination of the facts in the instant case, we find that Devon Bank failed to establish that the delay in completion of construction was entirely attributable to Royal. The contract provided that upon certification of the architect, the owner could terminate the contractor's employment and charge the latter with the expense of finishing the work, including costs for additional professional and administrative services. It further provided that the owner, upon certification by the architect that the contractor repeatedly refused to supply sufficient labor and materials for the proper progress of the work under the contract, may charge the contractor with his prorated share of damages incurred, such as rent loss. However, we find no evidence that the architect made any certification to the owner pursuant to the foregoing provisions of the contract. Nor was there evidence presented as to the exact date the

building was in fact completed. Although Devon Bank introduced evidence as to the earliest dates when Royal could have commenced its performance, there was no evidence of a completion date for Royal's contract other than that the entire building "can be completed by July 14, 1966." Furthermore, there was no evidence tending to show that the entire building would have been completed by the specified date even if Royal had performed prior to July 14, 1966. There was also no evidence as to when the other contractors would have finished if plaintiff had maintained proper progress of its job or when the other contractors were required to be finished. See *Sperry v. Fanning.*

■■ As stated in *Edward Edinger Co. v. Willis* (1931), 260 Ill.App. 106, 126, "It is incumbent upon one erecting a building to keep the work in such a state of forwardness as to enable the contractors to complete their work within the time limit." In the instant case, the evidence failed to establish that Devon Bank, or its architect on its behalf, complied with such obligation. Royal's contract did not specify a completion date for its portion of the work. It did provide that the work was to be *started* as required by the architect's work schedule so that the *building* could be completed by July 14, 1966, and further, that each contractor should be responsible for his pro-rata share of the completion time. Although required by the contract, neither Devon Bank nor its architect furnished Royal with an " 'Operations Schedule' setting up sequence of operations and time table for each principal item of new work and for each area in any existing buildings wherein work or alteration is shown or required." The evidence established that the schedule was neither furnished to nor received by Royal. The evidence does show several requests made of Royal to complete certain items of its contract by certain dates, but there is a fatal lack of evidence as to when Royal was to commence work on such items which would have allowed other contractors to complete their portions of work for completion of the entire building by the target date of July 14, 1966. No evidence was offered as to when the building was in fact completed. Moreover, there was no evidence that the architect ever certified to Devon Bank, as owner, as required in the specifications, that any cause existed to charge any contractor with damages for delay; this notwithstanding that Devon Bank's witnesses admitted to delays having been caused by other trades.

■■■ The burden of proving the essential elements of the counterclaim to charge Royal with the delay was on Devon Bank as counterplaintiff. After examining the record we are unable to conclude that the burden was sustained. The evidence is insufficient to prove that the delay in completion of the building was attributable under the contract to Royal. (See *Ahmer v. Peters* (1958), 17 Ill.App.2d 113, 149 N.E.2d 503.) Where

110

a judgment is wholly unjustified by the evidence and clearly against the manifest weight, it is the right and duty of a reviewing court to set the judgment aside. (*Kuperman v. Leak* (1974), 20 Ill.App.3d 491, 314 N.E.2d 504.) We conclude that the judgment on the counterclaim finding Royal liable for the delay in completion of the building is unjustified and against the manifest weight of the evidence. Therefore, it is not necessary to consider the damages claimed to have resulted therefrom.

For the reasons set forth, we hold that the judgment on the complaint and the counterclaim is contrary to the manifest weight of the evidence. (See *Hulke v. International Manufacturing Co.* (1957), 14 Ill.App.2d 5, 142 N.E.2d 717; and *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill.2d 352, 226 N.E.2d 624.) Therefore, the judgment of the circuit court of Cook County on the counterclaim is reversed; the judgment dismissing Royal's complaint is reversed and the cause remanded for further proceedings thereon consistent with the views expressed in this opinion.

Reversed and remanded in part.

McGLOON, P. J., and McNAMARA, J., concur.