In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3660

DELTA CONSULTING GROUP, INCORPORATED,

*Plaintiff-Appellee,*

*v.*

R. RANDLE CONSTRUCTION, INCORPORATED
AND RONALD S. RANDLE,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 C 504—**Michael J. Reagan**, *Judge.*

ARGUED OCTOBER 23, 2008—DECIDED FEBRUARY 5, 2009

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* R. Randle Construction, Inc., and
Ronald S. Randle (collectively, "Randle") entered into
two construction contracts with Belleville Township
High School District 201 (School District) to perform

work as a general contractor on the Belleville East High School Project (Project). Disputes over the Project arose between Randle and the School District, which caused delays, which in turn, caused Randle to suffer financial losses. Randle hired Delta Consulting Group, Inc. (Delta) to prepare and present a Request for Equitable Adjustment (REA) to the School District, to recover the damages attributable to the School District. Delta expressed that the REA's preparation, which included the necessary services, could typically be accomplished with the approximate preliminary budget of $34,000.00. Delta's proposal stated that the figure represented an estimate of the amount normally required for these types of jobs. Randle paid Delta a $5,000.000 retainer.

Using documents and information provided by Randle, Delta produced an REA representing damages for approximately $1.6 million. The REA consisted of three phases: (1) Familiarization and Initial Assessment, which included a review of Randle's documentation, site visits, key personnel interviews and assessment of claim issues; (2) Detailed Analysis and Report, which included extensive analysis of issues, a schedule analysis and a calculation of damages reflected in an REA; and (3) Dispute Resolution, which included Delta's attendance at dispute resolution proceedings.

Delta submitted the REA to the School District in an effort to recover Randle's damages. The School District, through its representative, Landmark Contract Management, Inc. (Landmark), reviewed the REA and concluded that the accompanying documents and analysis did not support $1.6 million in damages. At Randle's request,

Delta undertook additional services to revise the REA using additional documentation from Randle; Delta submitted a second REA for approximately $1.7 million.[1]

On February 25, 2004, Delta and Randle met with Landmark to discuss the resubmitted REA. Landmark reviewed the claims with Delta and questioned the lack of documentation to support the School District's liability for Randle's damages. Although Delta attempted to address Landmark's concerns, Landmark again found that the documentation did not adequately support the REA claim.

On March 5, 2004, Randle met with Landmark to discuss the resubmitted REA; frustrated with Delta's previous interactions with Landmark, Randle did not invite Delta to this meeting. Landmark repeated its concerns that the documentation submitted by Delta did not support the REA claim. Randle abruptly ended the meeting and claimed that he would sue the School District.

Throughout this process, Randle received Delta's invoices for the REA services and continuously paid the invoices through March 9, 2004.[2] Delta ultimately billed Randle $144,174.35; Randle paid $62,622.19 without objection (excluding the $5,000 retainer).

---

[1] Sometime after the submission of the revised REA, the School District offered, and Randle rejected, $100,000.00 to settle the claim.

[2] Although the date is unknown, the district court determined that Randle terminated Delta's services sometime after its last payment on March 9, 2004.

Randle hired a private firm and sued the School District for damages caused by the delay of the Project. Delta accepted Randle's request that Delta refrain from pursuing immediate collection on the unpaid invoices until Randle's claim had been litigated. Ultimately, Randle settled its claim with the School District for $450,000.00.

In October 2004, Randle's accountants conducted an audit of Randle's financial statements. As part of the audit, Randle, through its agent, sent Delta a letter to confirm that $89,302.16 was the amount due to Delta as of September 30, 2004. Delta responded that the correct amount due was $81,552.16. Randle did not object after receiving Delta's response until roughly a year later.

When Delta sought payment on the unpaid invoices, Randle responded that it was not satisfied with Delta's performance and should not be charged for inadequate work. Delta sued Randle to recover $81,552.16 in unpaid invoices (ultimately seeking $76,552.16 after applying the initial retainer), plus 9% interest as permitted by law. Randle claimed that Delta failed to adequately present the REA and counterclaimed for breach of contract.

On August 23, 2007, the district court granted Delta's summary judgment motion in its entirety. Specifically, the district court held that the communications between Delta and Randle, which included Randle's failure to object to Delta's statement of account within a reasonable time and Randle's partial payment of the account over the preliminary estimate, established an account stated. The district court also awarded summary judgment in favor of Delta on Randle's counterclaim; Randle

impliedly waived its right to damages for Delta's alleged breach by paying, and not contesting, $62,622.19.

On October 25, 2007, the district court further ordered: (1) that prejudgment interest at the Illinois statutory rate of 5% be awarded to Delta; and (2) that postjudgment interest at the Illinois statutory rate of 9% be awarded to Delta until Randle pays the judgment.

This timely appeal followed.

## DISCUSSION

Randle argues that, as a matter of law, the district court erred in holding that an account stated existed against Randle, where genuine issues of material fact are present as to the amount owed to Delta. Randle also claims that genuine issues of material fact exist to preclude summary judgment on the waiver of its breach of contract counterclaim. Randle further argues that the district court improperly struck a portion of this counterclaim. Finally, Randle argues that the district court applied the incorrect rate to the postjudgment interest award. We review *de novo* the district court's decision to grant summary judgment, construing all the facts and inferences in favor of Randle, the nonmoving party. *See Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008). We also apply the substantive law of Illinois, the state in which this diversity case was filed. *See Global Relief Found., Inc. v. New York Times Co.*, 390 F.3d 973, 981 (7th Cir. 2004).

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions

on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005). If the moving party meets this burden, the non-moving party must submit evidence that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Springer*, 518 F.3d at 483-84.

We address each issue in turn.

## A. Account Stated

Randle first claims that summary judgment was improper because the existence of an account stated was in dispute.

An "account stated" determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them. *Protestant Hospital Builders Club, Inc. v. Goedde*, 424 N.E.2d 1302, 1306 (Ill. App. Ct. 1981). When a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, that statement constitutes an acknowledg-

ment and recognition by the latter of the correctness of the account, together with a promise, express or implied, for the payment of such balance, and establishes an account stated. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 520 (Ill. App. Ct. 1985); *Motive Parts Co. of Am., Inc. v. Robinson*, 369 N.E.2d 119, 122 (Ill. App. Ct. 1977). In this manner, the debtor and creditor have a meeting of the minds as to the accuracy of the account and have manifested their mutual assent to the agreement. *Toth v. Mansell*, 566 N.E.2d 730, 734-35 (Ill. App. Ct. 1990). The manner of acquiescence is not critical, and the meeting of the minds may be inferred from the parties' conduct and the circumstances of the case. *Id.* at 735.

Randle repeatedly argues that it would not have entered into an agreement where it would pay over four times what it initially expected to pay. Delta's preliminary estimate stated that preparation and presentation of a typical REA would normally cost approximately $34,000.000; Randle continuously paid the invoices after it had reached the preliminary budget figure. Significantly, Randle ultimately paid $62,622.19, excluding the $5,000.00 retainer, almost twice the estimate. Although Randle suggests that the total amount billed should be roughly around the preliminary estimate, the parties did not contractually lock themselves into the preliminary estimate. The parties mutually assented to continuing services under the proposal because Randle continued to pay invoices for Delta's services. *See In re Marriage of Angiuli*, 480 N.E.2d 513, 518 (Ill. App. Ct. 1985) ("Assent to an account stated may be shown by payment or part payment of the balance.").

In addition to part payments, Randle's active conduct specifically established an account stated for the remaining, unpaid invoices. Randle initiated an agreement, that Delta accepted, in which Delta would withhold efforts to collect on the unpaid invoices while Randle attempted to resolve the Project dispute through litigation. By this agreement, Randle impliedly acknowledged that it owed payment to Delta for unpaid invoices after its last payment on March 9, 2004. It is unreasonable to believe that a transacting business would ask for more time to pay a debt it did not acknowledge it incurred.

More importantly, Randle settled any doubt that it owed money to Delta by its actions in October 2004. Randle acknowledged the accuracy of its debt to Delta when Randle, through its agent, requested that Delta confirm a balance due of $89,302.16. Delta responded that it was only owed $81,552.16. Randle argues that it never agreed to the accuracy of the account by this occurrence; the correspondence is not an acknowledgment of a debt, but rather a potential debt reflected on its books. Based on our review of the record, we agree with the district court that Randle's request was made to confirm an actual amount owed. The language of the request, written by Randle, is telling: "Our auditors . . . are conducting an audit of our financial statements. Please confirm the amounts $89,302.16 *due to you*." Thus, when Delta replied, listing the unpaid invoices in an itemized statement, it rendered a statement of account to Randle.

Our only inquiry now is whether the parties mutually assented to the amount billed. To determine this, we look

to whether Randle acquiesced in the correctness of the statement by retaining it beyond a reasonable time without objection. We conclude that Randle failed to object to the statement of account within a reasonable time.

Throughout its brief, Randle argues that its acceptance of invoices and partial payments of those invoices did not establish an account stated because, to use Randle's words, payments made on those invoices were made "before Randle came to the realization that it had made a mistake by hiring Delta." Randle argues that once the first REA had been rejected by Landmark, its frustration was relayed to Delta and repeated after subsequent REA rejections. Randle argues that because it only paid a portion of the total billings, it objected to the excessive amount billed.

The record, however, reveals otherwise. Although Randle may have been frustrated with Delta's performance, Randle continued to pay through its frustration, impliedly acknowledging the debt incurred. Randle paid invoices after the denial of the first REA and continued to pay after the denial of the resubmitted REA. More importantly, Randle privately met with Landmark on March 5, 2004, at the pinnacle of its frustration with Delta, and still made a payment four days later on March 9, 2004. Randle's subjective frustration alone did not constitute a refusal to pay the invoices or a contest on the amount billed. Randle's behavior was not a valid objection to the account stated.

Moreover, Randle's failure to object did not stop there. Months after Delta had fallen out of Randle's good

graces, Randle sent Delta a letter to confirm the amount owed to Delta; significantly, when Randle received Delta's response indicating a lower amount, Randle did nothing. Randle even states that it "did nothing because there was nothing [it] needed to do." Randle believed that its failure to respond did not constitute an acknowledgment of a debt because such an acknowledgment was not intended, as its dissatisfaction already constituted its objection. But as noted above, the objective facts establish that an account was rendered and Randle did not object to it. Randle never contested Delta's accounting statement and even conceded at oral argument that there is no documentation of its objection. Thus, Randle acquiesced in the correctness of that statement by failing to object to it within a reasonable time and that acquiescence is sufficient to establish an account stated between the parties. *Protestant Hospital Builders*, 424 N.E.2d at 1306.

Furthermore, Randle did not present evidence to open the account stated. "A court will not open an account stated absent showing fraud, omission or mistake." *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985); *see also Meeker v. Fowler*, 341 N.E.2d 412, 415 (Ill. App. Ct. 1976). Randle's conclusory statements that it did not subjectively agree to the amount owed, without presenting evidence of fraud, omission or mistake, are not sufficient to oppose summary judgment. *Hall v. Printing and Graphic Arts Union*, 696 F.2d 494, 500 (7th Cir. 1982).

Accordingly, Randle provided no evidence that it objected within a reasonable time to Delta's confirmation

of $81,522.16 (excluding the retainer) in unpaid invoices; it did not raise a genuine issue of material fact regarding the existence of an account stated.

### B.  Individual Liability

Next, Randle argues that the district court erred in holding Ron Randle, as an individual, also liable for Delta's unpaid invoices. Although the record reflects that Delta sent its invoices to R. Randle Construction Inc. and Delta only received payments from the corporation, Delta sued both the corporation and Randle individually and Randle never challenged the claim against his individual capacity before the district court. The lack of capacity to sue or be sued is a defense that must be pleaded with specificity or it is waived. *See* Fed. R. Civ. P. 9(a); *see also Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manor, Inc.*, 929 F.2d 343, 345-46 (7th Cir. 1991) (failure to raise the issue of capacity by direct negative averment waives the defense) (citations omitted). Importantly, not only did Randle not contest his individual capacity below, he also counterclaimed on behalf of the corpora- tion *and as an individual*; therefore this argument is waived before our court. *See Karazanos v. Madison Two Assoc.*, 147 F.3d 624, 629 (7th Cir. 1998).

### C.  Waiver

Randle argues that the district court erred because genuine issues of material fact exist as to whether Randle waived its breach of contract claim for $62,622.19. The district court, while assuming, without finding, that

Delta breached, held that Randle had waived any right to damages by its conduct in relation to Delta's consulting services. We agree; we also assume, without holding, that Delta breached the contract, but need not address the issue because Randle impliedly waived its right to damages under that claim.

In Illinois, waiver is the voluntary and intentional relinquishment of a known right. *United States v. Sumner*, 265 F.3d 532, 537 (7th Cir. 2001); *Gallagher v. Lenart*, 874 N.E.2d 43, 56 (Ill. 2007). Waiver may be made by an express agreement or it may be implied from the conduct, acts or words of the party who is alleged to have waived a right. *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991). "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Id.*; *see also PPM Finance, Inc., v. Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004) (waiver implied when a party's conduct is inconsistent with an intention to assert that right). Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive. *The Galesburg Clinic Assoc., v. West*, 706 N.E.2d 1035, 1037 (Ill. App. Ct. 1999). Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver. *Wald v. Chicago Shippers Assoc.*, 529 N.E.2d 1138, 1147-48 (Ill. App. Ct. 1988). However, if the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to the inferences to be drawn from the

undisputed evidence, then the issue becomes a question of fact. *Id.* at 1148.

Randle argues that the district court erred as its actions do not clearly and unequivocally indicate a desire to relinquish its right to repayment of $62,622.19. Although the district court held that Randle's conduct impliedly waived the right, Randle states that its failure to demand the money paid and later acknowledgment of a larger debt owed to Delta are not inconsistent with Randle's intent to enforce its rights on damages. Specifically, Randle argues that its frustration with Delta's deficient work and the lack of a substantiated REA exemplified that Delta had not earned the money it was paid, or as Randle put it, the money that Delta successfully extracted from Randle. However, we conclude that Randle's conduct supports its implied waiver and therefore will not disturb the district court's decision on this issue.

The undisputed, objective facts sufficiently evidence a finding of waiver. As previously described above, Randle had been paying Delta's invoices after: (1) the preliminary budget had been reached; (2) the preliminary budget had been far exceeded; (3) the first submitted REA had been rejected; (4) the re-submitted REA had been rejected; and (5) Randle's hostile meeting with Landmark. Such conduct did not reasonably portray Randle's objection of payment for the services rendered and does not reflect Randle's desire to seek its money back. In fact, these actions established the opposite; even though Delta's work was not what Randle expected, Randle continuously accepted Delta's performance by paying for

it and never once objecting to it. *See Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1343 (7th Cir. 1983) (citing *Royal Ornamental Iron, Inc. v. Devon Bank*, 336 N.E.2d 105, 110 (Ill. App. Ct. 1975)) (waiver may arise "by conduct manifesting a continued recognition of the contract's existence after learning of the breach thereof, such as by continuing to accept performance of the contract and to have the benefit thereof.").

More importantly, Randle not only failed to contest what was paid, it acknowledged further indebtedness by asking Delta to suspend collection and by not objecting to the receipt of Delta's lowered statement of account. As previously discussed, Randle never objected to the invoices, never sought return of the money paid and kept paying; this objective conduct manifested a clear, unequivocal and decisive intention to waive its rights.

### D.  Striking Portion of Counterclaim

Randle next argues that a portion of its counterclaim, labeled by the district court as "Reconstructing or Reproducing Delta's Amended REA," should not have been struck by the district court. The district court held that this claim was made without basis and should have been amended or withdrawn, and because it was not, the court struck this portion of the counterclaim. We review a district court's decision to strike for an abuse of discretion and will not disturb a decision that is reasonable and not arbitrary. *Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739, 745 (7th Cir. 2005); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998). Under this

standard, we find that the district court's actions were proper.

Rule 12(f) provides that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The court may either strike on its own or on a motion by a party and has considerable discretion in striking any redundant, immaterial, impertinent or scandalous matter. *Id.*; *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992). Randle's counterclaim, in pertinent part, sought damages for the amount paid to the law firm to entirely re-construct a third and final REA, after Delta could not do what it was hired to. Undisputably, a third REA was never created. Randle later attempted to explain that the damages sought were the contingent fee payment to the law firm which would not have been necessary had Delta properly performed its duties. The district court quoted Randle that the law firm was hired to file suit and not to re-present the REA to the School District and struck the claim as without basis. The district court alternatively found that had Randle amended this claim to seek the contingent fee, Randle would still have failed.

Here, Randle needlessly spends much of its argument on this issue addressing the district court's alternative decision that had Randle amended his claim seeking attorney's fees, there would still have been no recovery. We need not consider this alternative argument because Randle failed to sufficiently argue what is properly before our court: whether the district court abused its discretion when it struck the portion of the counterclaim.

On this issue, Randle's opening brief dedicated only five lines of argument that consisted entirely of a false suggestion and a conclusory allegation. First, Randle begins by suggesting that the district court erred when it "struck this component of the [c]ounterclaim although no motion to strike had been filed by [Delta]." However, Rule 12(f) expressly tells us that a court can act on its own. Fed. R. Civ. P. 12(f)(1). Second, Randle states that "this reference to a potential measure of damages does not constitute redundant, immaterial, impertinent, or scandalous matter." However, Randle does not, and could not, elaborate on this conclusory allegation because, as the district court properly found, there is no basis for the claim at all. A third REA was never created. In addition, the district court never prohibited Randle from amending its counterclaim, and we note that Randle never sought leave of court to file its amendment. Randle simply failed to amend this portion of its counterclaim, leaving behind an impertinent, immaterial claim that was well within the discretion of the district court to strike. *See Talbot*, 961 F.2d at 665 (district court did not abuse discretion in striking allegations devoid of factual basis under Rule 12(f)).

### E.   Postjudgment Interest

Lastly, the district court imposed a 9% postjudgment interest rate under Illinois law. Randle argues and Delta, at oral argument, concedes that 28 U.S.C. § 1961(a) applies. Accordingly, we remand this case solely to determine the appropriate postjudgment interest rate under the federal statute.

## CONCLUSION

We affirm the district court's grant of summary judg-ment in favor of Delta on all factual issues but remand this case only for the appropriate calculation of postjudgment interest.